KAHN, Judge.
This is an appeal from a final order entered by appellee, the Department of Banking and Finance (Department), on January 14, 1994, ordering Credicorp, Inc. (Credi-corp) to cease and desist certain activities under chapters 520 and 687, Florida Statutes, and imposing administrative fines total-ling $4,078,000 against appellants Credicorp, John Rheinfrank,[1] who served as its president until his departure from the company in the fall of 1992, and Steven Brown, who served as its vice-president, treasurer and secretary prior to becoming the company’s president after Rheinfrank’s departure. Appellants were specifically charged with violating the licensing provisions for retail installment contractors found in section 520.32,[2] Florida Statutes, and the loan broker provisions in section 687.141,[3] Florida Statutes. Appellants contend that (1) the licensing provisions for retail installment sellers in sections 520.30-.42 violate the Commerce Clause in the Constitution of the United States; (2) even if the licensing provisions do not violate the Commerce Clause, they do not apply to Credicorp because they do not cover retail installment contracts not entered into in Florida; (3) because Credicorp is not a loan broker as defined in section 687.14(4),[4] it did not violate the provisions of section 687.141 by collecting an advance fee from borrowers in exchange for its services as a loan broker; and (4) the penalty[5] imposed is unduly harsh. We affirm in part and reverse in part the Department’s final order.
*378 I
Credicorp, originally incorporated under the name FAFCO in 1990, is a Texas corporation not authorized to do business in Florida. Credicorp operates a nationwide mail-order catalog business, and its only place of business is in Dallas, Texas. Credicorp has been operating in Florida since 1990, but none of its offices, employees, or independent contractors are located in Florida. Its services include providing discount coupons for retail establishments and privilege card benefits for discounts at hotels and car rental agencies. It advertises in Florida by sending solicitations to Florida residents. Certain solicitation forms placed in the record read:
TELEGRAM
Approval No.:
[account number specified]
Approval Expiration Date: [date specified] [Name and address of targeted individual] Congratulations [targeted individual],
You have been pre-approved for a Gold Card with a $10,000 line of credit.
* Mail your $29.95 annual fee by check or money order by (specified date) along with this signed notice to activate your credit immediately.
Failure to do so will result in our reevaluation of your eligibility. Make check or money order payable to Credicorp Gold Card.
Sincerely,
Robert J. Armstrong
New Accounts Manager
Respond Today!
Recently the solicitations have included a 60-day money back guarantee and a disclaimer in small type indicating Credicorp’s lack of affiliation with a financial institution. For the relevant time period, the above solicitation constituted the only document provided to a Florida consumer before the consumer responded by sending money to Credicorp. The solicitation does not list any services that Credicorp provides and does not indicate that the “Gold Card” is actually a catalog card that can only be used to purchase merchandise from Credicorp’s catalogs.
As of June 1993, approximately 1,600,000 individuals nationwide had submitted membership applications and paid the $29.95 annual fee to Credicorp. On a single day, June 24, 1992, Florida residents sent Credicorp 243 applications, each accompanied by $29.95. A small sampling of Credicorp’s membership records established that Credicorp solicited advance fees from at least 640 Florida residents. From a quick review of order forms in the record, it appears that Credicorp has received over one thousand merchandise orders from Florida residents.
After the customer submits a preapproved application and pays the membership fee, Credicorp mails a “fulfillment package” to the customer. This package was the first notice to the consumer that he or she has joined a catalog shopping club. The fulfillment package includes a “Home Values and Gifts” catalog to facilitate purchases from Credicorp. The customer may then purchase merchandise by submitting a completed and signed order form, contained in the catalog, to Credicorp. According to the price list and terms of Credicorp’s catalog shopping program, two prices were available to a Credicorp customer — a cash price plus shipping and handling or a credit price with a 12% financing fee. A credit order requires a cash down payment. Any merchandise purchased on credit arrives with an installment coupon book for each item ordered. Upon receipt of an order form, Credicorp verifies the customer’s current membership, the status of the member’s account, and the availability of items ordered. After approval, Credicorp fills the order and ships the merchandise from Texas to the out-of-state customer via interstate carrier.
In July 1992, the Department advised Credicorp that it might be acting as a loan broker in violation of chapter 687, Florida Statutes. Subsequently, the Department advised Credicorp that it might also be an unlicensed retail installment seller in violation of chapter 520, Florida Statutes. Credi-corp sent a letter in response, indicating its position that it does not do business in Florida and, even if it did, it does not fall within the definition of “loan broker” because it *379 arranges credit only between its customers and itself.
On January 13, 1993, the Department filed an administrative complaint charging Credi-corp with violating various provisions of chapters 516, 520, 687 and 817, Florida Statutes. Before the final hearing, the Department withdrew its allegations that Credieorp violated chapters 516 and 817. The Department alleged Credieorp was a “loan broker” under chapter 687 and was violating section 687.141 by collecting an advance fee from boiTowers in exchange for its services as a loan broker and making misleading representations or omissions in connection with the offer or sale of its services. The Department also alleged that Credieorp was an unlicensed retail installment seller in violation of section 520.32(1). Credieorp timely filed a response to the administrative complaint and requested a formal hearing.
On July 23, 1993, a DOAH hearing officer convened an administrative hearing. The Department called its lead investigator as its only witness and placed in the record numerous examples of solicitations, membership fulfillment packages, and order forms. On October 4, 1993, the hearing officer issued findings of fact and conclusions of law recommending that the Department order Credi-corp to cease and desist all activities in violation of chapter 687, levy an administrative fine against Credieorp in the amount of $3,578,000 and assess additional fines of $250,000 against Rheinfrank and Brown in their capacity as officers of Credieorp under chapter 687. The Department’s final order essentially adopted the hearing officer’s preliminary statement, findings of fact and conclusions of law except that it rejected the hearing officer’s finding that Credicorp’s solicitations operated as a fraud or deception upon Florida residents. Although the hearing officer did not include a specific recommendation that Credieorp cease and desist any activities in violation of chapter 520, the Department so ordered. Credieorp timely appealed.
II

Application of Licensing Provisions to Interstate Commerce

The Department adopted the hearing officer’s conclusion that “Florida’s requirement that all retail installment sellers[6] doing business in Florida be licensed does not unduly burden interstate commerce and does not discriminate in any way against interstate commerce.” As the reviewing court, however, we must reach our own determination concerning the constitutional validity of the licensing requirement as applied to a corporation with no physical presence in Florida.
The Commerce Clause of the United States Constitution prohibits a state from imposing a use tax upon a nonresident business which solicits orders from the state’s residents, but maintains no contact with the state except by mail or interstate carrier. Quill Corp. v. North Dakota, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992); National Bellas Hess, Inc. v. Department of Revenue of III, 386 U.S. 753, 758, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967) (“[this] Court has never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with the customers in the State is by common carrier or the United States mail”). Florida courts have also applied this prohibition to the imposition of a license tax. Olan Mills v. City of Tallahassee, 100 So.2d 164 (Fla.1958), cert. denied, 359 U.S. 924, 79 S.Ct. 604, 3 L.Ed.2d 627 (1959) (where corporation was engaged in interstate commerce exclusively in taking photographs beyond the borders of the state, the city ordinance imposing license taxes on all photographers within the city was invalid as to corporation as attempt to place a direct tax on privilege of engaging in interstate commerce); Armstrong v. City of Tampa, 118 So.2d 195 (Fla.1960) (flat-sum license or privilege tax applied to Avon impeded flow of interstate commerce and therefore violated Commerce Clause because it was imposed on solicitors as a condition precedent to engaging in interstate commerce and was subject to being duplicated by every community into which Avon might enter); City of Tampa v. *380 Carolina Freight Carriers Corp., 529 So.2d 324 (Fla. 2d DCA 1988) (occupational license tax, as applied to Carolina Freight’s facility, violates Commerce Clause). We are constrained by these cases and find the licensing provisions in chapter 520 may not be constitutionally applied to Credicorp because they constitute a flat-sum licensing tax which, according to the above eases, violates the Commerce Clause. If we were writing on a clean slate, we would hold otherwise. Although the licensing provision in section 520.32(2) requires each retail installment seller to pay a “non-refundable application fee not exceeding $200” and section 520.32(3) further requires payment of a “renewal fee not exceeding $200,” the licensing provision is, in our view, not merely a tax. It is first and foremost state regulation of a matter of local concern through the police power.
The instant case is similar to California v. Fairfax Family Fund, Inc., 235 Cal.App.2d 881, 47 Cal.Rptr. 812 (1964), appeal dismissed, 382 U.S. 1, 86 S.Ct. 34, 15 L.Ed.2d 6 (1965). In that case the court held that a Kentucky corporation engaged in the business of making small loans by mail to residents of California and 31 other states, which had loans of $3,500,000 outstanding to California residents and was increasing the amount of loans to them at a rate of about $90,000 per week, was doing business in California and, as a result, California had the power to license and regulate this business the same as local concerns. The defendant solicited its business by mailing printed material from Kentucky to persons in California. The borrower returned by mail a loan application and promissory note, and the defendant secured a California independent contractor to conduct a local credit investigation. After approval, the defendant mailed a check to the borrower, who made all payments by mail to the defendant’s offices in Kentucky. The defendant maintained no offices in California, nor did any of its corporate officers reside in that state. Despite the amount of loans made to California residents, the defendant never secured a small loan license as required by California Financial Code section 24200 which provided: “No person shall engage in the business of making or negotiating, for himself, or another, loans of money, credit, goods, or things in action, in the amount or of the value of three hundred dollars ($300) or less, without first obtaining a license from the commissioner.”
The California appeals court held that the Commerce Clause has not withdrawn from the state the power to regulate or control matters of local concern so long as Congress has not acted in the area,[7] the regulation is nondiscriminatory, and the regulation does not impose a burden on interstate commerce. 47 Cal.Rptr. at 813. Our review of the ease law suggests the correctness of that proposition. See California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219 (1941) (Court held that statute requiring every transportation agent to procure license from State Railroad Commission, pay license fee, and file bond does not violate Commerce Clause in absence of pertinent regulation by Congress and where regulation does not unnecessarily obstruct interstate commerce, affects matters of local concern which are in other respects within state regulatory power, and where regulation does not infringe on national interest in maintaining free flow of commerce and preserving uniformity in regulation of commerce); Robertson v. California, 328 U.S. 440, 447, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946) (“We are far beyond the time when, if ever, the word ‘license’ per se was a condemnation of state regulation of interstate business done within the state’s borders.... For the commerce clause is not a guarantee of the right to import into the state whatever one may please, absent a prohibition by Congress, regardless of the effect of the importation upon the local community.”). In areas affecting the health, life and safety of their citizens, the courts have allowed reasonable and nondiscriminatory regulation. Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (ban on imported baitfish did not violate Commerce Clause in that it served legitimate local purpose, i.e., protecting native fisheries from parasitic infection *381 and adulteration by non-native species, that could not be served as well by available nondiscriminatory means); Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); Operation Badlaw, Inc. v. Licking County Gen. Health Dist. Bd. of Health, 866 F.Supp. 1059 (S.D.Ohio 1992), aff'd, 991 F.2d 796 (6th Cir. 1993); Mercer v. Hemmings, 170 So.2d 33 (Fla.1964) (statute requiring out-of-state CPAs to obtain certificate to practice in Florida did not violate Commerce Clause because of state’s legitimate interest in maintaining standards of that profession).
Specifically, in Taylor, the Court held: The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to “place itself in a position of economic isolation,” it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.
477 U.S. at 151, 106 S.Ct. at 2454 (citation omitted).
The Supreme Court has recognized: [T]here are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number and diversity may never be adequately dealt with by Congress. Because of their local character, also, there is wide scope for local regulation without impairing the uniformity of control of the national commerce in matters of national concern and without materially obstructing the free flow of commerce which were the principal objects sought to be secured by the Commerce Clause. Notwithstanding the Commerce Clause, such regulation in the absence of Congressional action has, for the most part, been left to the states by the decisions of this Court.
Thompson, 313 U.S. at 113, 61 S.Ct. at 932. The Court in Thompson went on to note:
[Fraudulent or unconscionable conduct of those so engaged which is injurious to their patrons, is peculiarly a subject of local concern and the appropriate subject of local regulation. In every practical sense regulation of such conduct is beyond the effective reach of Congressional action. Unless some measure of local control is permissible, it must go largely unregulated.
313 U.S. at 114, 61 S.Ct. at 932. Justice Scalia, concurring in the judgment in Quill Corp., wrote, “Even before Bellas Hess, we had held, correctly, I think, that state regulatory jurisdiction could be asserted on the basis of contacts with the State through the United States mail. See Travelers Health Assn. v. Virginia ex rel. State Corp. Comm’n, 339 U.S. 643, 646-650, 70 S.Ct. 927, 928-931, 94 L.Ed. 1154 (1950) (Blue Sky laws).” 504 U.S. at 298, 112 S.Ct. at 1904.
In Fairfax Family Fund, the California appeals court noted that the small loan law, which serves primarily to protect citizens of California from fraudulent and unconscionable conduct of those in the lending business, constitutes a matter of local concern for the purpose of determining whether it violates the Commerce Clause insofar as a lender engaged in interstate commerce is concerned. 47 Cal.Rptr. at 813. The Commerce Clause does not preclude a state from giving needful protection to its citizens in the course of their contacts with businesses conducted by outsiders when the legislation is general in its scope, is not aimed at interstate or foreign commerce, and merely involves burdens incident to effective administration. 47 Cal.Rptr. at 815. The court noted that no question of discrimination existed because the statute applied to both interstate and intrastate lending agencies. The court explained that the degree of regulation is not disproportionate to the evils that exist if the lenders are left to their own devices without regulation by the state. Id. The licensing procedure imposes charges or expenses no larger in amount than are reasonably necessary to defray the administrative costs involved and could not, in any event, qualify as discriminatory or imposing undue restrictions on interstate commerce. Id. To deny the state the power to license and regulate this business as it does for local concerns engaging in the same business would, in ef- *382 feet, grant an immunity to which it is not entitled under the circumstances. Id. The court noted that “[a]s a practical matter, it would be next to impossible for the state to regulate the activities of this business without the license requirement.” Id. Finally, the court observed that when the burdens imposed by local legislation become too great, Congress may legislate to secure uniformity or to protect the national interest as this is a legislative, not a judicial, function. Id.
The instant case is analogous to the above regulatory cases. The licensing provision in section 520.32 involves a local concern that the state has the power to regulate, that has not been regulated by Congress, and that does not discriminate against, or in any respect unnecessarily obstruct, interstate commerce. Moreover, the provision is designed to safeguard the people of Florida from deceitful practices and conduct such as that undertaken by Credicorp.
In our view, the Florida Legislature envisioned the licensing of retail installment sellers such as Credicorp. Section 520.36, entitled “Mail order and telephone sales,” indicates the legislative intent to include within the licensing provisions retail installment contracts negotiated and entered into by mail or telephone.[8] We are nonetheless constrained to find that the licensing provision, with its flat tax rate, falls within controlling precedent and is therefore unconstitutional. Penalties assessed for a violation of chapter 520 must be set aside as must the finding of violation itself. In addition, we certify the following as a question of great public importance:
MAY FLORIDA IMPOSE A LICENSING REQUIREMENT AND ANNUAL FEE UPON A RETAIL INSTALLMENT SELLER THAT ACTIVELY SOLICITS AND SELLS TO FLORIDA RESIDENTS, BUT REACHES THIS STATE ONLY BY UNITED STATES MAIL AND COMMON CARRIER?
III

Retail Installment Seller

Because we have elected to certify this issue as a question of great public importance, we reach Credicorp’s additional contention that it may not be regulated under chapter 520 because it does not enter retail installment contracts in Florida.
The licensing requirement of section 520.32(1) is applied to “a retail seller engaging in retail installment transactions.” A retail installment transaction means “a contract to sell or furnish or the sale of or the furnishing of goods or services by a retail seller to a retail buyer pursuant to a retail installment contract_” § 520.31(11), Fla. Stat. A “ ‘retail installment contract’ or ‘contract’ means an instrument or instruments reflecting one or more retail installment transactions entered into in this state pursuant to which goods or services may be paid for in installments.” § 520.31(10), Fla.Stat. Credicorp argues that under section 520.31(10), a contract must be entered into in Florida before the state can require a license. In Credieorp’s view, orders by Florida consumers are offers that Credicorp must accept, in Texas, before a contract is formed. Credicorp thus denies that any of its contracts are entered into in Florida. The Department obviously takes a contrary view, arguing that a contract of sale developed when the Florida consumer accepted Credi-corp’s offer to sell, as described in the terms, conditions, and prices in the Credicorp catalog, by submitting the completed and signed order form.
The hearing officer considered these arguments and found “[a] contract of sale can be formed by acceptance of an offer to sell as well as by acceptance of an offer to buy. Peters v. E.O. Painter Fertilizer Co., 73 Fla. 1001, 75 So. 749 (1917).” Recommended Order, at 12. Significantly, however, he also *383 found that “[o]rder forms filled out in Florida by Florida residents are surely among the ‘instruments reflecting one or more retail installment transactions’ to which Section 520.31(9), [sic] Florida Statutes (1991) refers.” Id. The latter observation is astute and correct. The statutory scheme in question does not merely assume a meaning for “contract” or “retail installment contract.” Rather, section 520.31(10) provides a specific definition. That definition of contract as “an instrument or instruments reflecting one or more retail installment transactions entered into in this state” may not strictly accord with commercial usage of the term. Nonetheless, “[w]here the legislature has used particular words to define a term, the courts do not have the authority to redefine it.” Baker v. State, 636 So.2d 1342, 1343-1344 (Fla.1994); see also Deehl v. Knox, 414 So.2d 1089 (Fla. 3d DCA 1982) (statutes should be construed to reflect the common law, unless the legislature clearly indicates otherwise). Therefore, the Department, as the agency responsible for compliance with the statute, did not abuse its discretion in finding that Credieorp entered into “retail installment contracts” in this state.
IV

The Loan Broker Act

A
We affirm the Department’s ruling that appellants violated provisions of sections 687.141(1) and (3). Although appellants contend that Credieorp is not a loan broker as defined in section 687.14(4)[9], our review of the record and the statute leads to a contrary conclusion. Primarily, appellants contend that Credieorp fits the exception in the loan broker act for any “retail installment sales company ... licensed by and subject to regulation or supervision of any agency of the United States or this state and ... acting within the scope of the license.” § 687.14(4), Fla.Stat. They urge that because the federal government does not license retail installment companies and because Florida cannot require Credieorp to be licensed in Florida without offending the Commerce Clause, Credieorp falls within the exception for retail installment companies. We disagree. Even if the state cannot require Credieorp to be licensed in Florida, Credieorp may not shelter itself under the definition in section 687.14(4), which excepts only retail installment sales companies licensed by any agency of the United States or Florida. Interstate concerns such as Credieorp that decide to pursue business in Florida have the choice of either voluntarily submitting to licensure, and thereby falling within the statutory exception, or complying with Florida’s regulation that prohibits certain loan brokering acts. Credieorp chose not to voluntarily submit to licensure; therefore, it was required to play by the rules found in chapter 687. The loan broker provisions, sections 687.14-687.148, viewed in light of the cases discussed in section II, supra, constitute a permissible exercise of Florida’s police power.
We do not view Florida’s regulatory scheme as the type of overtly protectionist legislation that has been rightly condemned under the Commerce Clause. An example of such may be found in Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). That case presents a classic example of what the Court concluded to be “parochial legislation” in the sense that it “overtly prevents foreign enterprises from competing in local markets.” 447 U.S. at 27, 100 S.Ct. at 2009. The statute in question in Lewis, section 659.141(1), Florida Statutes, prohibited an out-of-state bank holding company from owning or controlling a Florida business that sells investment advisory services to any customer. This statute was apparently passed at the prompting of the Florida Bankers Association and certain individual banks, once they became aware of the prospect of Bankers Trust (BTIM) opening an investment advisory service in Palm Beach County. Under the terms of the statute, Bankers Trust, which principally conducted its business outside Florida, could not acquire, own, or control, directly or indirectly, any Florida bank or trust company where the business of banking or trust business or functions are conducted, or from which such business furnishes invest *384 ment advisory services. According to the complaint filed in Lewis, that particular statute, when read in conjunction with section 660.10, Florida Statutes, prohibiting any corporation, other than a state chartered bank and trust company or a national banking association located in Florida from performing certain trust or fiduciary functions, prohibited Bankers Trust from establishing a subsidiary trust company having a national bank charter or a Florida state charter that would engage exclusively in one or more of the functions regulated by section 660.10, Florida Statutes. Thus, the subsidiary, BT Investment Managers, and its prospective parent, Bankers Trust, were completely locked out of the market in Florida. The record in the case also showed that, but for the offending Florida statute, the Federal Reserve Board would have permitted Bankers Trust to engage in the proposed business.
In the present case, retail installment companies that submit to Florida licensure are not subject to the loan broker provisions. Nonetheless, it would require a great stretch to conclude that the statute acts as a barrier specifically to out-of-state firms, or that instate retail installment sellers have a significant competitive advantage that may not be overcome by interstate businesses. In Lewis, the court rightfully concluded that the Florida scheme resulted in “outright prohibition of entry, rather than some intermediate form of regulation (as) the only effective method of protecting against the presumed evils....” 447 U.S. at 43, 100 S.Ct. at 2019. The statute presently under review regulates, rather than prohibits, loan brokering, and Credieorp raises no argument that it is unable to meet one of the exceptions of section 687.14, only that it may not constitutionally be required to meet one of the exceptions.
Our research has located, and we now distinguish, other cases in which the state legislation at issue had a clear protectionist motivation. E.g., National Meat Association v. Deukmejian, 743 F.2d 656, 657 (9th Cir. 1984) (“the purpose of the law was to promote the California beef industry”); Miller v. Publicker Industries, Inc., 457 So.2d 1374 (Fla.1984) (tax preference afforded to domestic gasohol had the practical effect of putting an importer of gasohol out of business as far as the Florida market was concerned); Delta AirLines, Inc. v. Department of Revenue, 455 So.2d 317 (Fla.1984) (tax credit for Florida based airlines discriminates against interstate commerce because the corporate tax credit provides a direct commercial advantage to Florida based common carriers over non-Florida based carriers).
We are not persuaded that a different result is required by Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), a ease relied upon heavily by the dissenting opinion, but not cited at all by Credieorp in any of its briefs. In Hughes, a commercial minnow dealer challenged an Oklahoma statute that prohibited transporting or shipping outside the state of Oklahoma for sale minnows seined or procured from waters within Oklahoma. Hughes adopted the view that had been previously put forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):
“Where the statute regulates even handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits ... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.”
441 U.S. at 331, 99 S.Ct. at 1733. The statute involved in Hughes went far beyond mere discrimination against interstate commerce; rather, it “overtly blockfed] the flow of interstate commerce at [the] State’s borders.” 441 U.S. at 337, 99 S.Ct. at 1737, quoting, Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). In an effort to protect its natural resources, Oklahoma chose the method that most overtly discriminated against interstate commerce. Condemning this “most discriminatory means,” the Supreme Court noted the existence of “nondiscriminatory alternatives” ad *385 equate to fulfill Oklahoma’s legitimate local purpose. 441 U.S. at 338, 99 S.Ct. at 1737. By using the plural term “alternatives,” it appears the Supreme Court will allow a state some discretion to fulfill a legitimate local purpose where it is demonstrated that the state has not elected to utilize the most discriminatory means, which is overt blockage of the flow of interstate commerce.
Under our holding in this case, interstate firms may either voluntarily comply with the Florida state licensing provisions or may comply with the substantive regulatory provisions. This case is, thus, different from those eases in which the out-of-state company found itself, as the result of protectionist legislation, unable, by any means, to obtain the same treatment afforded to domestic companies.
B
Credicorp next argues that it does not fall within the definition of a “loan broker” contained in section 687.14(4). A “loan broker” is:
[A]ny person, ... who: (a) ... arranges or attempts to arrange or offers to fund a loan of money, a credit card, or a line of credit; (b) • • • assists or advises a borrower in obtaining or attempting to obtain a loan of money, a credit card, a line of credit, or related guarantee, enhancement, or collateral of any kind or nature; (c) acts for or on behalf of a loan broker for the purpose of soliciting borrowers; or (d) holds himself out as a loan broker.
§ 687.14(4), Fla.Stat. The Department did not show that Credicorp arranges loans of money. We must thus determine whether Credicorp qualifies as a loan broker under any of the remaining sections of the statutory definition. In particular, a loan broker also includes any person who arranges or attempts to arrange a line of credit or a credit card, or who holds himself out as a loan broker.
Credicorp denies any involvement in lines of credit, as that term is defined in section 687.0303.[10] Appellants contend that the statutory definition of fine of credit does not include the commercial definition of the phrase, which actually describes what Credi-corp does: the extension of credit by a retailer for use by the consumer in purchasing that retailer’s goods. We do not read the definition so narrowly, nor do we believe such a construction fits the loan broker provisions when read in pari materia. As previously noted, the statute excepts from its provisions licensed retail installment sales companies which, like Credicorp, extend only credit for sale of their own merchandise. If such sellers were not otherwise under the regulatory ambit, no need would exist for an exception. In our estimation, Credicorp’s installment sales practices are the functional equivalent of advancing money to a debtor. Moreover, we are convinced the Department did not abuse its discretion by finding that Credicorp held itself out as a loan broker by offering a line of credit and a credit card.
The solicitation sent to Florida consumers proclaimed, “You have been pre-approved for a Gold Card with a $10,000 line of credit." The term “credit card” is not defined in chapter 687. Black’s Law Dictionary, however, defines “credit card” as:
Any card, plate or other like credit device existing for the purpose of obtaining money, property, labor or services on credit. The term does not include a note, check, draft, money order or other like negotiable instrument.
Black’s Law Dictionary 367 (6th ed.1990). Credicorp’s Gold Card falls within that definition because it exists for the purpose of obtaining property, i.e., merchandise from Credieorp’s catalog on credit. Credicorp itself refers to the Gold Card as a credit card in its Members Only Finance Guide: “All credit card purchases carry a finance charge on the amount financed at the Annual Per *386 centage rate of just 12%.” In addition, the order forms Credicorp sends to members includes the following language: “Please enter the following items to be charged to my Gold Credit Card.” The Credicorp Rules and Regulations pamphlet also makes repeated reference to use of the Gold Card to purchase merchandise.
The initial solicitation portrays Credicorp as a loan broker by stating without qualification that the targeted consumer has been pre-approved for a “Gold Card with a $10,000 line of credit.” Nothing in this mailing informs the consumer that this line of credit has any restrictions or is not really a line of credit as defined in section 687.0303, Florida Statutes. Similarly, in its solicitations, Cred-icorp fails to mention that the Gold Card is actually a catalog card and cannot be used to purchase services or merchandise from other retailers. We reject Credicorp’s argument that it is protected because the line of credit and credit card offers were in truth neither.
V
Finally, the award of penalties was within the permissible range as found in section 687.143 and is supported by competent substantial evidence. The Department therefore acted within its discretion and this court may not overturn the penalty. See Florida Real Estate Comm’n v. Webb, 367 So.2d 201 (Fla. 1978); Arpayoglou v. Department of Prof. Reg., 603 So.2d 8 (Fla. 1st DCA 1992).
AFFIRMED in part; REVERSED in part; question certified.
BARFIELD, J., concurs.
ALLEN, J., concurs in part & dissents in part with written opinion.

. Mr. Rheinfrank died on October 25, 1993.

. Section 520.32, Florida Statutes, provides in material part:
(1)A person may not engage in or transact the business of a retail seller engaging in retail installment transactions as defined in this part or operate a branch of such business without a license, except that a license is not required for a retail seller whose retail installment transactions are limited to the honoring of credit cards issued by dealers in oil and petroleum products licensed to do business in this state.

. Section 687.141 provides:
No loan broker shall:
(1) Assess or collect an advance fee from a borrower to provide services as a loan broker.
(2) Make or use any false or misleading representations or omit any material fact in the offer or sale of the services of a loan broker or engage, directly or indirectly, in any act that operates or would operate as fraud or deception upon any person in connection with the offer or sale of the services of a loan broker, notwithstanding the absence of reliance by the buyer.
(3) Make or use any false or deceptive representation in its business dealings or to the department or conceal a material fact from the department.

. Section 687.14(4) defines “loan broker" as:
[A]ny person, except any bank or savings and loan association, trust company, building and loan association, credit union, consumer finance company, retail installment sales company, securities broker-dealer, real estate broker or salesperson, attorney, federal Housing Administration approved lender, credit card company, installment loan licensee, mortgage broker or lender, or insurance company, provided that the person excepted is licensed by and subject to regulation or supervision of any agency of the United States or this state and is acting within the scope of the license; ... who:
(a) For or in expectation of consideration arranges or attempts to arrange or offers to fund a loan of money, a credit card, or a line of credit;
(b) For or in expectation of consideration assists or advises a borrower in obtaining or attempting to obtain a loan of money, a credit card, a line of credit or related guarantee, enhancement, or collateral of any kind or nature;
(c) Acts for or on behalf of a loan broker for the purpose of soliciting borrowers; or
(d) Holds himself out as a loan broker.

.Penalties were imposed pursuant to section 687.143(3), Florida Statutes (1991), which provides:
(3) The department may impose and collect an administrative fine against any person found to have violated any provision of this act, any rule or order promulgated by the department, or any written agreement entered into with the department in any amount not to exceed $5,000 for each violation. All fines collected hereunder shall be deposited in the Division of Finance Regulatory Trust Fund.

. Credieorp agrees that it is a retail installment seller.

. The parties in the present case have advised the court that Congress has not acted to regulate or license retail installment sellers.

. Section 520.36 provides:
Retail installment contracts negotiated and entered into by mail or telephone without personal solicitation by salesmen or other representatives of the seller, when a catalog of the seller or other printed solicitation of business which is distributed and made available generally to the public clearly sets forth the cash price and other terms of sales to be made through such medium, may be made as provided in this section.

. Supra, note 4.

. Section 687.0303 provides:
(1) The term “line of credit,” whenever used in this chapter, means an arrangement under which one or more loans or advances of money may be made available to a debtor in one transaction or a series of related transactions.
(2) The Legislature hereby declares that, as a matter of law, “line of credit,” as such term is defined in this section, is deemed to have been included in and governed by the provisions of this chapter as it existed prior to, on and subsequent to July 1, 1979.