684 So.2d 746 (1996)
DEPARTMENT OF BANKING AND FINANCE, STATE OF FLORIDA, Appellant,
v.
CREDICORP, INCORPORATED, etc., et al., Appellees.
CREDICORP, INCORPORATED, etc., et al., Petitioners,
v.
DEPARTMENT OF BANKING AND FINANCE, STATE OF FLORIDA, Respondent.
Nos. 86601, 86624.
Supreme Court of Florida.
October 31, 1996.
Rehearing Denied December 17, 1996.
*747 Paul C. Stadler, Jr., Assistant General Counsel, and Robert A. Fox, Assistant General Counsel, Office of the Comptroller, Tallahassee, for Appellant/Respondent.
William E. Williams, Rex D. Ware and Vikki R. Shirley of Huey, Guilday & Tucker, P.A., Tallahassee, for Appellees/Petitioners.
ANSTEAD, Judge.
We have for review Credicorp, Inc. v. Department of Banking & Finance, 659 So.2d 376 (Fla. 1st DCA 1995), which passed upon the following questions certified to be of great public importance:
[1] MAY FLORIDA IMPOSE A LICENSING REQUIREMENT AND ANNUAL FEE UPON A RETAIL INSTALLMENT SELLER THAT ACTIVELY SOLICITS AND SELLS TO FLORIDA RESIDENTS, BUT REACHES THIS STATE ONLY BY UNITED STATES MAIL AND COMMON CARRIER?
[2] MAY FLORIDA CONSTITUTIONALLY APPLY THE LOAN BROKER ACT, SECTION 687.14-687.148, FLORIDA STATUTES, TO AN OUT-OF-STATE RETAIL INSTALLMENT SELLER WHICH, UNDER THE COMMERCE CLAUSE, MAY NOT BE COMPELLED TO BE LICENSED IN FLORIDA AS A RETAIL INSTALLMENT SALES COMPANY UNDER SECTION 520.32, FLORIDA STATUTES?
Id. at 382, 388. We have jurisdiction. Art. V, § 3(b)(1),(4), Fla. Const.[1] We answer the first certified question in the affirmative and uphold section 520.32, Florida Statutes (1995). We decline to answer the second certified question as it is mooted by our answer to the first certified question.

FACTS AND PROCEEDINGS BELOW
The facts of this case are set out in the hearing officer's order under findings of fact:
1. Credicorp, Incorporated (Credicorp) is a Texas corporation whose principal place of business is located in Dallas, Texas. Credicorp is not licensed pursuant to chapter 520, Florida Statutes, and never has been. Originally incorporated in 1990 under the name FAFCO, Credicorp began *748 mailing solicitations to Florida in November of 1990.
2. John Rheinfrank was president of Credicorp from November of 1990 until October of 1992. Since then, Stevan Brown, who has been corporate secretary at all pertinent times, has served as president. Credicorp has no employees or agents in Florida, and owns no property in Florida. Credicorp has not registered to do business in Florida and does not collect Florida sales or use taxes.
3. Credicorp mails solicitations, also called invitations, to Florida residents and others. Before the corporate name change, invitations sent to prospects read as follows:
TELEGRAM
APPROVAL NO.: [account number specified]
APPROVAL EXPIRATION DATE: [date specified]
[Name and address of targeted individual]
YOU HAVE BEEN PRE-APPROVED FOR A GOLD CARD WITH A $10,000 LINE OF CREDIT.
*MAIL YOUR $29.95 ANNUAL FEE BY CHECK OR MONEY ORDER BY (specified date) ALONG WITH THIS SIGNED NOTICE TO ACTIVATE YOUR CREDIT IMMEDIATELY.
FAILURE TO DO SO WILL RESULT IN OUR REEVALUATION OF YOUR ELIGIBILITY. PLEASE RETURN THIS TELEGRAM WITH PAYMENT BY (date specified). MAKE CHECK OR MONEY ORDER PAYABLE TO FAFCO GOLD CARD.
SINCERELY,
ROBERT J. ARMSTRONG,
NEW ACCOUNTS MANAGER
RESPOND TODAY!
Petitioner's Exhibit No. 19. Robert J. Armstrong, the putative accounts manager, does not exist. Recently invitations have included a 60-day moneyback guarantee and a disclaimer in small type disclosing Credicorp's lack of affiliation with a financial institution.
4. The solicitation arrives in an enveloped stamped "DATED MATERIAL: YOUR IMMEDIATE REPLY REQUESTED," and the return address is shown as "CREDIT APPROVAL DEPT."
5. Ordinarily the solicitation contains all the information an individual receives before paying money to Credicorp to secure its services. Respondents offer potential customers residing in Florida a "Gold Card" with "a $10,000 line of credit" at a 12% annual interest rate, in exchange for a $29.95 fee.
6. The services Credicorp in fact provides to members are offers to sell merchandise, loans for purchasing the merchandise that Credicorp sells, assorted coupons, and hotel and rental car discounts. Not one of these services is clearly identified on the initial solicitation sent to potential members.
7. After the customer submits a pre-approved application and pays the membership fee, Credicorp mails a "fulfillment package." The customer must pay a $29.95 fee before Credicorp performs any service on the customer's behalf. The fulfillment package contains a letter that states, in part:
WELCOME TO CREDICORP, YOUR LINE OF CREDIT IS $10,000
HERE IS YOUR CREDICORP MEMBERSHIP CARD!
ACCOUNT #
START USING YOUR CREDICORP MEMBERSHIP AND BONUS COUPONS IMMEDIATELY TO PURCHASE NAME BRAND PRODUCTS FROM OUR HOME VALUES AND GIFT CATALOG. ENCLOSED IS OUR GIFT TO YOU, YOUR PREFERRED MEMBER SAVINGS COUPON BOOKLET WORTH UP TO $1,000.00 IN COUPONS REDEEMABLE IN YOUR AREA. ALSO SEE INFORMATION ENCLOSED ABOUT 50% DISCOUNTS AT THOUSANDS OF LOCATIONS THROUGHOUT THE U.S.

*749 This letter is the first notice Credicorp gives the "new member" that he or she has joined a catalogue shopping club.
8. The fulfillment package also contains a second letter addressed "Dear New Credicorp Member," a copy of the Credicorp Rules and Regulations, a collection of Home Values and Gifts Bonus Coupons, a booklet of Super Saver coupons, and the Home Values and Gifts catalogue. For the past six months or so, the package has contained an application for a "Privilege Card."
9. A member can purchase merchandise listed in the Home Values and Gifts catalogue by completing order forms contained in the catalogue and mailing them, along with payment, to Credicorp. Credicorp extends members a line of credit of up to $10,000 to purchase this merchandise. The member's "Gold Card" number must be included when ordering products from the catalogue.
10. A member cannot use the "Gold Card" to purchase goods or services from retail sellers other than Credicorp. Members cannot use their "Gold Cards" or their membership to obtain cash from anybody. The Better Business Bureau of Texas received over 34,000 inquiries in 1992 regarding Credicorp's activities.
11. Credicorp receives a mark-up on the merchandise it sells to members. Members who purchase merchandise on credit must initially submit a specified downpayment with the order. Two prices are available to a Credicorp member, a cash price and a "credit price," which reflects a 12% financing fee. Merchandise purchased on credit arrives with an installment coupon book for each item ordered.
12. The Credicorp Rules and Regulations, the order forms contained in the catalogue, and all other materials Credicorp provides members make no mention of any contingency once the member completes, signs and sends in a form order for merchandise with the amount of money required. Many Florida residents complete and sign these order forms in Florida. Credicorp has received at least 378 form orders for merchandise from Florida residents.
13. Approximately 1,600,000 individuals have submitted to Credicorp membership applications, each accompanied by $29.95. New members' names and addresses are entered into a computer data base and "batch edit sheets," each listing 100 names of new members, are printed.
14. Sample batch edit sheets obtained from Credicorp by the Department listed the names of 640 Florida residents who had sent a membership application form and $29.95 to Credicorp to obtain membership. On a single day, June 24, 1992, money and membership application forms from 243 residents of Florida reached Credicorp.
On the basis of these findings of fact, the hearing officer recommended the imposition of sanctions against Credicorp, John Rheinfrank[2] who served as Credicorp's president until his departure from the company in the fall of 1992, and Steven Brown who served as its vice-president, treasurer and secretary prior to becoming the company's president after Rheinfrank's departure, in their capacity as officers of Credicorp. In partial support of the recommendation, the hearing officer concluded that "One purpose Chapter 520 evinces is to protect Florida consumers from misleading solicitations." In essence, the hearing officer found, as detailed in the findings of fact, that Credicorp had engaged in extensive deceptive practices in its solicitations of Florida consumers. Subsequently, the Department approved the findings of the hearing officer and ordered Credicorp to cease and desist certain activities under both chapters 520 and 687, Florida Statutes (1991). The Department also imposed substantial administrative fines against Credicorp, Rheinfrank, and Brown.

APPEAL
On appeal to the First District, the district court affirmed in part, reversed in part, and certified two questions to this Court. The court held that (1) Credicorp was a retail installment seller under the Act, (2) the licensing *750 requirements of the Retail Installment Sales Act could not be applied to Credicorp without violating the Commerce Clause, (3) Credicorp was a loan broker as defined in section 687.14, Florida Statutes (1991), and (4) the Loan Broker Act applied to Credicorp and did not violate the Commerce Clause. Credicorp, Inc. v. Department of Banking & Finance, 659 So.2d 376 (Fla. 1st DCA 1995). The district court indicated that, absent controlling precedent, it would uphold the application of the licensing requirements of chapter 520 to Credicorp as a valid state regulatory measure and the imposition of sanctions under that chapter.

FIRST CERTIFIED QUESTION
The United States Constitution empowers Congress "To regulate Commerce with foreign Nations, and among the several States." Art. I, § 8, cl. 3, U.S. Const. The purpose of this provision was to ensure the free and unimpeded transportation and exchange of goods between the states. Armstrong v. City of Tampa, 118 So.2d 195, 199 (Fla.1960). On its face, the Commerce Clause is an affirmative grant of power to Congress. However, the negative implication of the clausethat the states cannot exercise power reserved to Congressis the source of the constitutional limits on state regulation and taxation of interstate commerce.
Generally speaking, statutes that represent the exercise of a state's police power are given less scrutiny under the Commerce Clause than those statutes enacted to raise revenue for the state.[3] Several reasons have been cited for the distinction between taxation and regulation. First, "[a] police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests." Freeman v. Hewit, 329 U.S. 249, 253, 67 S.Ct. 274, 277, 91 L.Ed. 265 (1946). Second, "[t]o deny to a State a particular source of income because it taxes the very process of interstate commerce does not impose a crippling limitation on a State's ability to carry on its local function." Id. Third, "the burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations." Id. In short, "[b]ecause the greater or more threatening burden of a direct tax on commerce is coupled with the lesser need to a State of a particular source of revenue, attempts at such taxation have always been more carefully scrutinized and more consistently resisted than police power regulations of aspects of such commerce." Id. Thus, determining the nature of the statute at issue is pivotal for purposes of analysis under the Commerce Clause. See Freeman v. Hewit, 329 U.S. 249, 253, 67 S.Ct. 274, 277, 91 L.Ed. 265 (1946)("The task of scrutinizing is a task of drawing lines."); see also Fulton Corp. v. Faulkner, ___ U.S. ___, ___, 116 S.Ct. 848, 854, 133 L.Ed.2d 796 (1996) (outlining constitutional tests for "state regulatory measures" versus "state taxation").
Accordingly, central to a Commerce Clause analysis here is whether section 520.32 constitutes (1) a general revenue tax, or (2) a regulatory measure enacted pursuant to this state's police power. See California v. Thompson, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219 (1941). Initially, we conclude that the fees charged by the State and the licensing requirements under chapter 520 constitute attempts at regulation rather than taxation.

TAXATION
To ensure that revenue taxes do not violate the principle that no state may "impose a tax which discriminates against interstate commerce... by providing a direct commercial advantage to local business," Northwestern States Portland Cement Co. v. Minnesota, *751 358 U.S. 450, 458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959), the Supreme Court has required that any state tax on interstate commerce must be (1) applied to an activity with a substantial nexus with the taxing state, (2) fairly apportioned, (3) nondiscriminatory against interstate commerce, and (4) fairly related to the services provided by the state, in order to pass constitutional muster. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under this analysis, the Supreme Court has held that out-of-state mail order sales companies like Credicorp, which have no physical presence in the taxing state, are immune from state sales or use tax liability. See, e.g., Quill Corp. v. North Dakota, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992); National Bellas Hess, Inc. v. Dept. of Revenue of Ill., 386 U.S. 753, 758, 87 S.Ct. 1389, 1392, 18 L.Ed.2d 505 (1967). We have recently reaffirmed that principle in the case of Department of Revenue v. Share International, Inc., 676 So.2d 1362 (Fla.1996), wherein we held that an out-of-state mail order sales company could not be compelled to pay or collect Florida sales or use taxes on its mail-order sales to Florida residents. In essence, this is the standard that was applied by the district court in holding that Credicorp, because it lacked a physical presence in Florida, could not be subject to licensing and regulation in Florida.

REGULATION
This stringent standard for appraising tax measures, however, does not strictly apply if the statute at issue qualifies as a regulatory measure. "General revenue taxes are state taxes levied against interstate commerce to raise general revenue." Center for Auto Safety, Inc. v. Athey, 37 F.3d 139, 142 (4th Cir.1994). Where a regulation is not essentially economic in purpose and effect, however, but is a social regulation designed to protect local interests, different considerations apply. Breard v. City of Alexandria, 341 U.S. 622, 638-39, 71 S.Ct. 920, 930-31, 95 L.Ed. 1233, 1246-47 (1951). In fact, the Supreme Court has recognized:
[T]here are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number and diversity may never be adequately dealt with by Congress. Because of their local character, also, there is wide scope for local regulation without impairing the uniformity of control of the national commerce in matters of national concern and without materially obstructing the free flow of commerce which were the principal objects sought to be secured by the Commerce Clause. Notwithstanding the Commerce Clause, such regulation in the absence of Congressional action has, for the most part, been left to the states by the decisions of this Court....
Thompson, 313 U.S. at 113, 61 S.Ct. at 932. "As long as a State does not needlessly obstruct interstate trade or attempt to `place itself in a position of economic isolation,' it retains broad regulatory authority to protect the health and safety of its citizens...." Maine v. Taylor, 477 U.S. 131, 151, 106 S.Ct. 2440, 2454, 91 L.Ed.2d 110 (1986) (citation omitted). In this regard, the district court observed:
Specifically, in Taylor [Maine v. Taylor], the Court held:
The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to "place itself in a position of economic isolation," it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.
....
The Court in Thompson [California v. Thompson] went on to note:
[F]raudulent or unconscionable conduct of those so engaged which is injurious to their patrons, is peculiarly a subject of local concern and the appropriate subject of local regulation. In every practical sense regulation of such conduct is beyond the effective reach of Congressional action. Unless some measure of *752 local control is permissible, it must go largely unregulated.
659 So.2d at 381 (citations omitted).

CHAPTER 520
Chapter 520, Part II, Florida Statutes (1995), contains an extensive regulatory scheme governing retail installment contracts. Section 520.32 provides in material part:
(1) A person may not engage in or transact the business of a retail seller engaging in retail installment transactions as defined in this part or operate a branch of such business without a license, except that a license is not required for a retail seller whose retail installment transactions are limited to the honoring of credit cards issued by dealers in oil and petroleum products licensed to do business in this state.
Section 520.32(2) requires a retail installment seller to pay a $200 fee for obtaining this license. After two years, a retail installment seller must renew its license by paying another $200 fee. Id. § 520.32(3). This license was clearly intended to reach mail-order sales. Id. § 520.36.[4] All funds received must be deposited into the Regulatory Trust Fund. § 520.998, Fla.Stat. (1995). Section 520.34 requires persons within and outside of Florida who wish to enter into retail installment sales to Florida residents to comply with its regulations. The fee provisions of chapter 520 ensure that all regulated licensees pay a share of the regulatory costs to protect Florida consumers from improper conduct by the licensees. Moreover, the statute requires that fitness for licensure be demonstrated initially and maintained thereafter.
In policing retail installment sales, the Department of Banking and Finance is authorized to conduct investigations and examinations, see section 520.996, Florida Statutes (1995), issue and serve subpoenas, administer oaths, seek injunctions, issue cease-and-desist orders, and impose administrative fines. § 520.994, Fla.Stat. (1995). The department may deny an application for license or revoke a license where, as has been established in the case at bar, there have been misrepresentations in retail installment transactions. § 520.995(1)(b), 2(a), 2(b), Fla.Stat. (1995). Accordingly, it appears that chapter 520 was not enacted as a measure to raise general revenue and does not impose a "tax" on interstate commerce for that purpose. Rather, it was enacted to provide consumer protection for Florida residents by requiring retail installment sellers to be licensed and to abide by the regulations set out in the chapter.
We must now determine whether the particular regulatory scheme set out in chapter 520 violates the Commerce Clause. To ensure that regulatory measures do not violate the Commerce Clause, the United States Supreme Court has devised a balancing test to assess the constitutionality of such measures. In determining the validity of a regulatory statute challenged under the Commerce Clause, a court must inquire:
(1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether *753 the statute serves a legitimate local purpose; and if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.
Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); see also Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) ("Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."). We find that the regulatory measure here meets all of the criteria set out in Hughes.
Numerous decisions have recognized and approved of a state's regulation of matters of local concern even though interstate commerce may be incidentally affected. See, e.g., Interstate Towing Ass'n, Inc. v. City of Cincinnati, 6 F.3d 1154 (6th Cir.1993); New Hampshire Motor Transport Ass'n v. Flynn, 751 F.2d 43 (1st Cir.1984); Aldens, Inc. v. LaFollette, 552 F.2d 745 (7th Cir.1977); City of Cleveland v. City of Brook Park, 893 F.Supp. 742 (N.D.Ohio 1995); People v. Fairfax Family Fund, Inc., 235 Cal.App.2d 881, 47 Cal.Rptr. 812 (1964); National Salvage & Serv. Corp. v. Commissioner of the Indiana Dep't of Envtl. Mgmt., 571 N.E.2d 548 (Ind. Ct.App.1991); Borough of Collingswood v. Ringgold, 66 N.J. 350, 331 A.2d 262 (1975). We are particularly persuaded by the reasoning of three decisions involving state regulatory statutes similar to chapter 520.

Aldens, Inc.
In Aldens, Inc. v. LaFollette, 552 F.2d 745 (7th Cir.1977), cert. denied, 434 U.S. 880, 98 S.Ct. 236, 54 L.Ed.2d 161 (1977), Aldens, an Illinois corporation, was selling merchandise by mail order in Wisconsin. Aldens asserted that Wisconsin's Consumer Act, which protects its residents from abuses in credit transactions, was void in its application to Aldens under the Commerce Clause. 552 F.2d at 746-47. In its analysis of the Commerce Clause issue, the Seventh Circuit distinguished National Bellas Hess, Inc.a "tax" casefrom the case before it"an exercise of the police power." Consequently, the court applied a balancing teststate regulations involving a legitimate state interest are not invalid because they affect interstate commerce unless the burden on such commerce is, on balance, clearly excessive in relation to local benefits. Id. at 749. Because it concluded that under the balancing test the Wisconsin Consumer Act was not an undue burden on interstate commerce, it upheld the Act. Id. at 753.
The facts of the Aldens case are very similar to those presented here. Aldens had no Wisconsin office nor any representative or tangible property there. Aldens mailed catalogs to Wisconsin residents four times a year and also mailed them supplemental advertisements six to eight times a year. Merchandise sold by Aldens to Wisconsin customers was sent to them by mail or common carrier from outside Wisconsin. Aldens did not advertise in the Wisconsin media and had no Wisconsin telephone listing. Further, Aldens was not required to collect and remit the Wisconsin use tax. Id. at 747-48. It would be difficult to find a factual situation more analogous to the facts here.

Center for Auto Safety, Inc.
The Fourth Circuit has also held that user fees charged for regulation should be distinguished from general revenue taxes for purposes of Commerce Clause analysis. Center for Auto Safety, Inc. v. Athey, 37 F.3d 139 (4th Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1401, 131 L.Ed.2d 289 (1995). In Athey, the court upheld a Maryland statute regulating out-of-state charitable organizations' solicitation practices in Maryland. The statute imposed a sliding scale fee on a charity, whether in state or out, based on a charity's nationwide level of public contributions.
At the outset, the court indicated that central to the Commerce Clause analysis in the case was whether the statute constituted a general revenue tax or a "user fee" assessed to defray the costs of state-provided services. Id. at 142. A general revenue tax, the court acknowledged, is a state tax levied against interstate commerce to raise general revenue and is subject to the stringent four-part *754 test set out in Complete Auto Transit. On the other hand, the court reasoned that this stringent standard does not apply when the state tax at issue is a "user fee." User fees are taxes or other fees collected by the state as reimbursement for use of state-owned or state-provided facilities or services such as those provided by the state in regulating particular commercial practices. The court believed the "Supreme Court has drawn a clear distinction between user fees and general revenue taxes, noting that `[b]ecause [user fees] are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services,' they `are not true revenue measures and ... the considerations applicable to ordinary tax measures do not apply.'" Id. The court noted that the "rationale for this distinction is that, where taxes are narrowly drawn to reimburse a state for its expenses, the possibility that the tax will discriminate against interstate commerce is sharply diminished." Id.
Citing United States Supreme Court precedent, the court held that to qualify as a constitutional user fee, a state tax must (1) reflect a fair, if imperfect, approximation of the cost of using state facilities for the taxpayer's benefit, (2) not discriminate against interstate commerce, and (3) not be excessive in relation to the costs incurred by the taxing authorities.[5] The court concluded that, under these principles, "the sliding scale fee imposed under the Maryland Statute is a constitutionally sound user fee." Id. at 143. Once again, although solicitation by charities is the activity regulated rather than installment sales, we find the regulatory scheme in Maryland to be similar to the regulatory scheme involved herein.

Fairfax Family Fund, Inc.
Finally, in People v. Fairfax Family Fund, Inc., the California appellate court held that a Kentucky corporation engaged in the business of making small loans by mail to residents of California was subject to California regulation. The defendant maintained no offices in California. The defendant solicited its business by mailing printed material from Kentucky to persons in California. The borrower returned by mail a loan application and promissory note, and the defendant secured a California independent contractor to conduct a local credit investigation. After approval, the defendant mailed a check to the borrower, who made all payments on the loan by mail to the defendant's offices in Kentucky.
The Kentucky corporation did business in thirty-one other states, but had loans of $3,500,000 outstanding to California residents, and was increasing the amount of loans to them at a rate of about $90,000 per week. Despite the amount of loans made to California residents, the defendant never secured a small loan license as required by California Financial Code section 24200 which provided: "No person shall engage in the business of making or negotiating, for himself, or another, loans of money, credit, goods, or things in action, in the amount or of the value of three hundred dollars ($300) or less, without first obtaining a license from the commissioner." The California appeals court held that the Commerce Clause had not withdrawn from the state the power to regulate or control matters of local concern so long as Congress had not acted in the area, the regulation was nondiscriminatory, and the regulation did not impose a burden on interstate commerce. 47 Cal.Rptr. at 813. The court held California had the power to license and regulate this business the same as local loan companies.
The district court below noted the similarity of this case to Fairfax Family Fund:
In Fairfax Family Fund, the California appeals court noted that the small loan law, which serves primarily to protect citizens of California from fraudulent and unconscionable conduct of those in the lending business, constitutes a matter of local concern for the purpose of determining whether it violates the Commerce Clause insofar as a lender engaged in interstate commerce is concerned. 47 Cal.Rptr. at *755 813. The Commerce Clause does not preclude a state from giving needful protection to its citizens in the course of their contacts with businesses conducted by outsiders when the legislation is general in its scope, is not aimed at interstate or foreign commerce, and merely involves burdens incident to effective administration. 47 Cal.Rptr. at 815. The court noted that no question of discrimination existed because the statute applied to both interstate and intrastate lending agencies. The court explained that the degree of regulation is not disproportionate to the evils that exist if the lenders are left to their own devices without regulation by the state. Id. The licensing procedure imposes charges or expenses no larger in amount than are reasonably necessary to defray the administrative costs involved and could not, in any event, qualify as discriminatory or imposing undue restrictions on interstate commerce. Id. To deny the state the power to license and regulate this business as it does for local concerns engaging in the same business would, in effect, grant an immunity to which it is not entitled under the circumstances. Id. The court noted that "[a]s a practical matter, it would be next to impossible for the state to regulate the activities of this business without the license requirement." Id. Finally, the court observed that when the burdens imposed by local legislation become too great, Congress may legislate to secure uniformity or to protect the national interest as this is a legislative, not a judicial, function. Id.

Credicorp, 659 So.2d at 381-82. We are in agreement with the district court's analysis.
Based on the approach of the above "regulatory" cases, we conclude the regulatory and licensing provisions in chapter 520 constitute permissible regulation and are not violative of the Commerce Clause. On this issue we agree with the district court:
The instant case is analogous to the above regulatory cases. The licensing provision in section 520.32 involves a local concern that the state has the power to regulate, that has not been regulated by Congress, and that does not discriminate against, or in any respect unnecessarily obstruct, interstate commerce. Moreover, the provision is designed to safeguard the people of Florida from deceitful practices and conduct such as that undertaken by Credicorp.
In our view, the Florida Legislature envisioned the licensing of retail installment sellers such as Credicorp. Section 520.36, entitled "Mail order and telephone sales," indicates the legislative intent to include within the licensing provisions retail installment contracts negotiated and entered into by mail or telephone.
Id. at 382. Pursuant to the provisions of chapter 520, it appears the Department is attempting to prohibit misrepresentations by retailers, whether in state or out, regarding ongoing retail installment contracts with residents of the State of Florida. The statute is designed to safeguard the people of Florida from deceitful practices and conduct such as that allegedly undertaken by Credicorp. Id. In fact, section 520.331 is specifically aimed at disciplining retail installment sellers who engage in fraud, misrepresentation, deceit, or gross negligence.[6] As noted by the hearing officer, one purpose of chapter 520's regulatory scheme is to "protect Florida consumers from misleading solicitations." It is also apparent that Credicorp's solicitation activities in Florida have been extensive. The hearing officer cited a single day's activity in 1992 reflecting that 243 Florida residents had sent money and application forms pursuant to Credicorp's promise of a "GOLD CARD WITH A $10,000 LINE OF CREDIT."
On the other hand, Bellas Hess and the other cases relied upon by Credicorp are sales and use tax cases. That is not the case here. Any fees charged here are patently intended to offset the costs to government of regulating retail installment sales. As noted by Justice Scalia in his separate opinion in *756 Quill Corp. v. North Dakota, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), courts should apply United States Supreme Court cases that specifically fit the situation in dispute, 504 U.S. at 319, 112 S.Ct. at 1916 (Scalia, J., concurring). The district court also quoted an important observation in Justice Scalia's concurring opinion in Quill Corp.:
"Even before Bellas Hess, we had held, correctly, I think, that state regulatory jurisdiction could be asserted on the basis of contacts with the State through the United States mail. See Travelers Health Assn. v. Virginia ex rel. State Corp. Comm'n, 339 U.S. 643, 646-650, 70 S.Ct. 927, 928-931, 94 L.Ed. 1154 (1950) (Blue Sky laws)." 504 U.S. at 298, 112 S.Ct. at 1904.
659 So.2d at 381. It would appear that the United States Supreme Court has itself limited the law of Bellas Hess to tax cases. We follow Justice Scalia's lead here.
We find that the licensing provision in section 520.32 involves a local concern that the state has the power to regulate, that has not been regulated by Congress, and that does not discriminate against, or in any respect unnecessarily obstruct, interstate commerce. See California v. Thompson, 313 U.S. 109, 114, 61 S.Ct. 930, 932, 85 L.Ed. 1219 (1941)("Fraudulent or unconscionable conduct of those so engaged which is injurious to their patrons, is peculiarly a subject of local concern and the appropriate subject of local regulation."); Merrick v. N.W. Halsey & Co., 242 U.S. 568, 37 S.Ct. 227, 61 L.Ed. 498 (1917). In fact, absent the enforcement of Florida's regulatory scheme, it is apparent that Credicorp's solicitations of Florida citizens could continue unabated and without sanction. We do not believe that Congress, or the Supreme Court in its interpretation of the Commerce Clause, has mandated such an outcome.
Accordingly, we answer the first certified question in the affirmative and hold that section 520.32 is a regulatory measure and, because of its evenhanded application to all retail installment sellers, is not violative of the Commerce Clause. We quash the decision of the district court on the constitutionality of section 520.32. By answering the first certified question in the affirmative and upholding section 520.32, we have mooted the second certified question. Accordingly, we decline to answer the second certified question. We recognize that our opinion is contrary to the district court's conclusion as to the validity and application of section 520.32 and that our holding may impact the resolution of the other issues raised in the district court. For that reason, we remand this case to the district court to address or reconsider any remaining issues as the district court may find necessary.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
NOTES
[1] The two consolidated cases sub judice originate from a single administrative complaint filed by the Department of Banking and Finance.
[2] Mr. Rheinfrank died on October 25, 1993.
[3] However, as Justice Frankfurter aptly commented:

A burden on interstate commerce is none the lighter and no less objectionable because it is imposed by a State under the taxing power than under manifestations of police power in the conventional sense. But, in the necessary accommodation between local needs and the overriding requirement of freedom for the national commerce, the incidence of a particular type of State action may throw the balance in support of the local need because interference with the national interest is remote or unsubstantial.
Freeman v. Hewit, 329 U.S. 249, 252-53, 67 S.Ct. 274, 276-77, 91 L.Ed. 265 (1946).
[4] Section 520.36, Florida Statutes (1995), provides:

Mail order and telephone sales.Retail installment contracts negotiated and entered into by mail or telephone without personal solicitation by salesmen or other representatives of the seller, when a catalog of the seller or other printed solicitation of business which is distributed and made available generally to the public clearly sets forth the cash price and other terms of sales to be made through such medium, may be made as provided in this section. All of the provisions of this part relating to contracts shall apply to such sales except that the seller shall not be required to deliver a copy of the contract to the buyer as provided in s. 520.34(1)(c), and if the contract when received by the seller contains any blank spaces, the seller may insert in the appropriate blank space the amounts of money and other terms which are set forth in the seller's catalog or other printed solicitation which is then in effect. In lieu of sending the buyer a copy of the contract as provided in s. 520.34(1)(c), the seller shall deliver to the buyer, not later than the date the first payment is due, a written statement of all disclosures required by this part. The seller shall be required to deliver a copy of the contract to the buyer at any time not later than when the first payment is due.
[5] Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).
[6] But see State v. Mobley, 234 N.C. 55, 66 S.E.2d 12, 19 (1951) ("While it may be conceded that regulations designed to prevent frauds are embraced within the scope of the police power, nevertheless an express purpose to prevent possible frauds does not justify state legislation which really goes beyond the legitimate pale of regulation and interferes with the free flow of interstate commerce.") (citations omitted).