[No. 65255-4. En Banc.]
Argued February 11, 1998. Decided November 12, 1998.

FRANKS & SON, INC., ET AL., *Appellants*, v. THE STATE OF WASHINGTON, ET AL., *Respondents*.

738

SᴀɴᴅᴇRs and AʟᴇxᴀɴᴅᴇR, JJ., dissent by separate opinion.

*Graham & James, L.L.P./Riddell Williams, P.S.*, by *Howard A. Coleman, Michael D. Pierson*, and *Robert M. Howie (Scopelitis, Garvin, Light & Hanson*, by *James H. Hanson, Lynne D. Lidke*, and *Robert L. Browning*, of counsel), for appellants.

*Christine O. Gregoire, Attorney General*, and *Jeffrey D. Goltz, Assistant*, for respondents.

DOLLIVER, J. — In 1990, Plaintiffs Franks & Son, Inc. and Coast Express, Inc. brought a class action suit on behalf of themselves and all other similarly-situated interstate truckers challenging the gross weight regulatory fee imposed by former RCW 81.80.320. That statute was repealed in 1993 and replaced with RCW 81.80.321, which imposes a fee based on gross income from operations occurring inside Washington state. In 1996, the Thurston County Superior Court held the repealed statute violated the Commerce Clause of the United States Constitution but, in a declaratory ruling, granted the Plaintiffs only prospective relief. Both parties directly appealed that decision. The Plaintiff-taxpayers argue they are entitled to retroactive relief in

the form of a refund of taxes paid. The State maintains the former statute was valid under the Commerce Clause and, in the alternative, that any holding of unconstitutionality should be prospective only. We retained the case and now reverse, finding the repealed statute imposed a constitutional regulatory fee. We decline to reach the issue of the trial court's remedy.

The State of Washington regulates the trucking industry and formerly funded all of the associated costs with a regulatory fee, the proceeds of which could be used only to offset the costs of regulation. LAWS OF 1971, 1st Ex. Sess., ch. 143, § 5, *previously codified* as RCW 81.80.320. The regulatory fee at issue was required by former RCW 81.80.320, which was repealed effective January 1, 1994, and provided:

> In addition to all other fees to be paid by him, every "common carrier" and "contract carrier" shall pay to the commission each year prior to receiving his identification decal or stamp or number for each motive power vehicle operated by him, based upon the maximum gross weight thereof as set by the carrier in his application for his regular license plates, plus any additional tonnage or log tolerance permits, the following fees: [Fees ranged from $7 for vehicles weighing less than 4,000 pounds to $48 for vehicles weighing 72,000 pounds or more.]
>
> . . . .
>
> It is the intent of the legislature that the fees collected under the provisions of this chapter shall reasonably approximate the cost of supervising and regulating motor carriers subject thereto, and to that end the utilities and transportation commission is authorized to decrease the schedule of fees provided in this section by general order entered before November 1st of any year in which it determines that the moneys then in the motor carrier account of the public service revolving fund and the fees currently to be paid will exceed the reasonable cost of supervising and regulating such carriers during the next succeeding calendar year. Whenever the cost accounting records of the commission indicate that the sched-

ule of fees as previously reduced should be increased such increase, not in any event to exceed the schedule set forth in this section, may be effected by a similar general order entered before November 1st. Any decrease or increase of gross weight fees as herein authorized, shall be made on a proportional basis as applied to the various classifications of equipment.

The annual regulatory fee was imposed in addition to a federally authorized "identification fee" which Congress and the Interstate Commerce Commission (ICC) established to offset state costs for filing and processing carriers' proof of interstate operations. Former RCW 81.80.300 made it unlawful for any carrier to operate vehicles within Washington unless both the identification fee and the regulatory fee were paid:

> It shall be unlawful for any "common carrier" or "contract carrier" to operate any motor vehicle within this state unless there is carried within the cab of the motive power vehicle . . . the identification cab card and decal or stamp or number required by this section and the payment by such carrier of a total fee of up to ten dollars for each such decal or stamp or number plus the applicable gross weight fee prescribed by RCW 81.80.320[.]

The regulatory fees were the Washington Utilities and Transportation Commission's (UTC) sole source of funding for the motor carrier safety enforcement program, which was one component of "supervising and regulating motor carriers." Former RCW 81.800.320. Within statutory ceilings, the UTC set the fee by order each August or September for the following year, and the carriers were notified of the amount shortly thereafter.

Unlike the federal fee, state law also allowed the UTC to establish alternatives to the per vehicle fee for carriers which traveled in interstate commerce and entered Washington infrequently. The UTC made such allowances by establishing single trip permits and "floater cards" which permitted carriers to purchase a limited number of such cards and transfer them among vehicles as they were sent into the state. Former RCW 81.80.300; RCW 81.80.318.

This case involves a constitutional challenge to the regulatory fee imposed by the UTC pursuant to former RCW 81.80.320, which was repealed effective January 1, 1994. In their complaint, filed in March 1990, Plaintiffs sought declaratory, injunctive, and refund relief on behalf of the following class certified by court order in September 1990:

All interstate motor carriers whose vehicles travel in and through the State of Washington and are therefore subject to and pay the regulatory fee pursuant to RCW 81.80.320.

Clerk's Papers at 332. The Plaintiffs made two constitutional claims. First, they contended the regulatory fee was unconstitutional because it imposed an unlawful burden on interstate commerce pursuant to the United States Supreme Court's "dormant" or "negative" Commerce Clause analysis in *American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 107 S. Ct. 2829, 97 L. Ed. 2d 226 (1987). Plaintiffs claimed:

The Regulatory Fee imposes an unappropriated, flat tax on Carriers unrelated to the actual miles a Carrier's motive power vehicles travel in Washington. The Regulatory Fee, therefore, imposes, on average, a higher cost per mile traveled in Washington on the motive power vehicles of Plaintiffs and all members of Plaintiffs' class that are not operated wholly within Washington than in the motive power vehicles of motor common or contract carriers that are operated wholly within Washington.

Clerk's Papers at 13. This claim became known as the "*Scheiner*" claim.

Second, Plaintiffs alleged the fee was preempted by federal law, specifically the Interstate Commerce Act, 49 U.S.C. § 11506, and its implementing regulations, and was thus imposed in violation of the Commerce Clause and its affirmative reservation of power to Congress to regulate commerce between the states. This claim became known as the "preemption" claim.

In April 1990, Plaintiffs sought a preliminary injunction

requiring the State to place into escrow regulatory fee proceeds not yet expended together with all fees collected pending the outcome of the case. The request was based on Plaintiffs' claim that, should they ultimately prevail on the merits, the State might assert an immunity defense to any refund claim.

In July 1990, the trial court issued an oral opinion denying the motion, noting that refunds would be "questionabl[e]." Clerk's Papers at 283. Addressing the *Scheiner* claim, the court acknowledged the necessity of proving discrimination with a factual showing:

> In *Scheiner*, of course, taxes were collected for highway construction and repair, which is necessarily correlated with the number of miles traveled. The regulatory fees at issue here fund various programs, including a vehicle safety inspection program. Although these inspections and the safety issues may well be directly related to miles traveled, as in the *Scheiner* case, this correlation has not at this juncture been established by the evidence.

Clerk's Papers at 280. The trial court concluded that "without that evidence, the court cannot determine that the plaintiffs are likely to prevail on the merits." Clerk's Papers at 281. The trial court also noted the Plaintiffs could protect themselves by bringing the matter to the merits before the next round of fee payments were due. In a later written order denying Plaintiffs' motion, the trial court reiterated its hesitance to rule favorably on the *Scheiner* claim in the absence of supporting evidence and found Plaintiffs were not likely to prevail on the preemption claim either.

Before the next year's fees were due, all parties moved for summary judgment. In March and April 1991, the trial court issued a letter opinion and corresponding order denying the parties' cross motions for summary judgment on the *Scheiner* claim and reaffirming its earlier view that the preemption claim should be denied. With respect to the *Scheiner* claim, the trial court again noted it was Plaintiffs' burden to prove the "factual unfairness" of the regulatory

fee, or, in other words, to produce evidence of discrimination. The trial court stated:

When Plaintiffs in this case sought temporary relief, the state argued, and I agreed, that those challenging the regulatory fee through commerce clause analysis have the burden of proving factual unfairness of the tax burden's effect on interstate commerce. Basically, Plaintiffs still have offered no admissible evidence on the issue . . . .

Clerk's Papers at 939-40.

From March 1991 to April 1996, further pursuit of discovery and various attempts to resolve the case through alternative means ensued. In the interim, the regulatory fee legislation was repealed by LAWS OF 1993, ch. 97, § 7. (Federal legislation in the form of the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, 105 Stat. 1914, intervened, authorizing the ICC to create a base state registration system for interstate carriers. Each state could impose a fee in lieu of the registration fee, not to exceed that amount earlier charged (in Washington's case, $10), and that fee would be collected by the carriers' base state and then transmitted to each state imposing the fees. The Congressional decision that each state could not register all carriers doing business in that state made it administratively difficult to impose any further regulatory fee in addition to the base state fee. The regulatory fee was therefore repealed on the date of the implementation of the base state program—January 1, 1994.)

In April 1996, Plaintiffs filed a second motion for summary judgment. They again challenged the regulatory fee on the basis of both the preemption claim and the *Scheiner* claim. This time they supported the *Scheiner* claim with a discrimination analysis which attempted to show that members of the Plaintiffs' class paid more per mile in fees than nonclass members. In their cross motion for summary judgment, the State successfully rebutted this evidence. In a declaratory ruling, the trial court determined federal law did not preempt imposition of the regulatory fee. Moreover, Plaintiffs had not demonstrated that the fee was discrimi-

natory. Nevertheless, the trial court held the regulatory fee violated the Commerce Clause because it was not fairly apportioned—specifically, it failed the "internal consistency" test required by dormant Commerce Clause analysis. The court found the regulatory fee was "much like" the fees charged users in *Scheiner* and was therefore subject to the internal consistency test for fair apportionment, which it failed. Clerk's Papers at 1506. The trial court ruled its decision should not be applied retroactively and denied Plaintiffs' request for a refund of taxes paid.

Plaintiffs now appeal, claiming they are entitled to retroactive relief, i.e., a full refund of fees paid since March 1987. Plaintiffs also ask this court to find the trial court wrongly decided the preemption claim. They do not appeal any of the rulings associated with the *Scheiner* claim (on which they prevailed); specifically, they do not ask this court to revisit the trial court's finding that the regulatory fee was not discriminatory.

The State cross-appeals, arguing the regulatory fee was not a tax and did not discriminate against interstate commerce; therefore, it claims, the trial court should not have declared it internally inconsistent (one measure of unfair apportionment) and hence unconstitutional. The State also responds to Plaintiffs' claims on appeal, arguing even if the regulatory fee was unconstitutional, retroactive application of the trial court's ruling is not warranted. Finally, the State counters that Congress did not preempt the regulatory fee.

We hold the repealed statute imposed a regulatory fee—not a tax—and did not violate the Commerce Clause. Because we find the fee was constitutionally sound, we do not address the Plaintiffs' argument that they are entitled to refunds of fees paid.

■ UNITED STATES CONSTITUTION article I, section 8, clause 3, known as the Commerce Clause, states: "The congress shall have power . . . [t]o regulate commerce with foreign nations, and among the several states[.]" The Commerce Clause does not forbid states from regulating interstate

carriers for safety and other purposes, even if the scope of the state regulation differs from that of other states and imposes burdens on interstate commerce. *See, e.g., Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523-24, 79 S. Ct. 962, 3 L. Ed. 2d 1003 (1959). Likewise, a state may impose a fee to offset the appropriate costs of regulation. *See, e.g., Great N. Ry. v. Washington*, 300 U.S. 154, 160, 57 S. Ct. 397, 81 L. Ed. 573 (1937); *Sprout v. City of South Bend*, 277 U.S. 163, 169, 48 S. Ct. 502, 72 L. Ed. 833 (1928). Indeed, even in the tax context, interstate commerce may be made to "pay its [own] way." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 281, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977). The first question at issue here is whether the means by which Washington opted to fund its regulatory program violated the "dormant" or "negative" implications of the Commerce Clause.

■ On its face, the Commerce Clause is an affirmative grant of power to Congress. However, the negative implication of the clause—that the states cannot exercise power reserved to Congress—is the source of constitutional limits on state regulation and taxation of interstate commerce. *Department of Banking & Fin. v. Credicorp, Inc.*, 684 So. 2d 746 (Fla. 1996), *cert. denied*, 522 U.S. 819 (1997).

Negative or "dormant" Commerce Clause analysis was at work in *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 107 S. Ct. 2829, 97 L. Ed. 2d 226 (1987). In *Scheiner*, the United States Supreme Court held Pennsylvania's annual flat highway use taxes were "plainly discriminatory" because they imposed a cost per mile on interstate truckers that was approximately five times as heavy as the cost per mile borne by local truckers. *Scheiner*, 483 U.S. at 286. Pennsylvania's flat taxes for the use of its roads also failed the "internal consistency" test, which, along with "external consistency," measures whether a tax is fairly apportioned. Internal consistency requires a state tax to "be of a kind that, 'if applied by every jurisdiction, there would be no impermissible interference with free trade.' " *Scheiner*, 483 U.S. at 284 (quoting *Armco Inc. v. Hardesty*,

467 U.S. 638, 644, 104 S. Ct. 2620, 81 L. Ed. 2d 540 (1984)). The Court concluded:

> If each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred.

*Scheiner,* 483 U.S. at 284 (footnote omitted).

The trial court analogized the regulatory fee at issue in this case to the flat highway use *Scheiner* taxes and found it did not pass the internal consistency test. It reached several crucial conclusions in its declaratory ruling. As a threshold matter, it declared former RCW 81.80.320 was facially neutral, i.e., it did not discriminate between interstate and intrastate carriers. Neither party contests this finding. Indeed, class carriers in this case paid the same as nonclass carriers; the regulatory fee was imposed on both.

Plaintiffs' claim on summary judgment, however, was that former RCW 81.80.320 was discriminatory in fact. Plaintiffs alleged that interstate carriers, generally, traveled fewer miles per year in Washington than intrastate carriers and therefore paid more per mile for the safety program, which the regulatory fee funded, than did intrastate carriers. Plaintiffs buttressed this allegation with the theory that the "burden" placed on Washington, which the safety program (and therefore the regulatory fee) was intended to ameliorate, was directly related to the miles traveled by each carrier. The trial court was not satisfied there was a relationship between miles and costs and therefore found the Plaintiffs had not proven the regulatory fee was discriminatory. Plaintiffs do not take issue with this portion of the ruling on appeal.

Having found there was no discrimination in fact, the trial court next addressed the question of "internal consistency" and asked whether imposition of a monetary assessment identical to the one in question by every other state would add no burden to interstate commerce that intrastate commerce would not also bear. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 184, 115 S.

Ct. 1331, 131 L. Ed. 2d 261 (1995). Because all states experience safety issues within their boundaries, the trial court reasoned, similar fees could be imposed, thereby creating a potential for multiple burdens on interstate commerce. The regulatory fee at issue therefore failed the internal consistency test. As a result, it was malapportioned and ran afoul of the Commerce Clause.

The problem with this analysis is that a *regulatory fee* is different from a *tax*. This dichotomy is more than semantics because, where *regulatory fees* have been found not discriminatory, apportionment, and therefore the internal consistency test, has not been at issue in the majority of cases. Having found the regulatory fee was not discriminatory, the trial court wrongly addressed apportionment.

■ The regulatory, police power of a state and its power to tax are treated differently for constitutional purposes.

> "[T]he burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations." *Freeman[ v. Hewit]*, 329 U.S. [249, 253, 67 S. Ct. 274, 91 L. Ed. 265 (1946)]. Because "[t]he power to tax is a dominant power over commerce . . . . [a]ttempts at such taxation have always been more carefully scrutinized and more consistently resisted than police power regulations of aspects of [interstate] commerce." *Id.*

*V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1422-23 (10th Cir. 1997). "Thus, determining the nature of the statute at issue is pivotal for purposes of analysis under the Commerce Clause." *Department of Banking & Fin.*, 684 So. 2d at 750 (citations omitted).

A tax is imposed under a state's taxing power, while a fee is imposed under a state's regulatory power. Revenues from a fee are used exclusively for the purpose of financing regulation; revenues from a tax may be used for other purposes. In *Union Pac. R.R. v. Public Util. Comm'n*, 899 F.2d 854 (9th Cir. 1990), the Ninth Circuit held a regulatory fee imposed by Oregon was not a tax and therefore fell

outside the scope of the prohibition in the Railroad Revitalization and Regulatory Reform Act (4-R Act) on state taxes that discriminate against rail carriers. Oregon's fee was similar to the UTC's regulatory fee in that none of the fee went to the general fund or was used for any purpose other than regulation. *Union Pac. R.R.*, 899 F.2d at 857. The Ninth Circuit distinguished between the taxing power and the power to regulate commerce, stating:

> [T]he concerns underlying the constitutional limitations imposed on the taxing power by article I, section 8 are relevant to measures having the primary objective of raising revenues for the general support of government, but not to measures having the primary objective of regulating commerce. Thus, a levy to collect the costs of regulation from those regulated is not to be treated as a tax to which the limitations of article I, section 8 apply.

*Union Pac. R.R.*, 899 F.2d at 859 (citations omitted).

■ Whether an exaction is a tax or a fee depends on whether its purpose is to raise revenue or to regulate an industry or services. *See, e.g., National Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S. Ct. 1146, 39 L. Ed. 2d 370 (1974). A tax is defined as a levy made for the purpose of raising revenue for a general governmental purpose; a fee is enacted principally as an integral part of the regulation of an activity and to cover the cost of regulation. *American Trucking Ass'ns v. O'Neill*, 522 F. Supp. 49 (D. Conn. 1981).

We recently articulated a three-part test to determine whether a charge imposed by a governmental entity is a fee or a tax. The first factor to consider is whether the primary purpose of the monetary assessment is to accomplish desired public benefits which cost money, or to regulate an industry or activity. If the primary purpose is to raise revenue, rather than to regulate, then the charge is a tax. "Conversely, if the primary purpose is regulatory, 'the charges are properly characterized as "tools of regulation,"

rather than taxes.' " *Covell v. City of Seattle*, 127 Wn.2d 874, 879, 905 P.2d 324 (1995) (quoting *Teter v. Clark County*, 104 Wn.2d 227, 239, 704 P.2d 1171 (1985)). The primary purpose of the fee in this case was to regulate the trucking industry, and specifically to conduct safety inspections and programs.

The second factor which we consider is whether the money collected must be allocated only to the authorized regulatory purpose. *Id.* Under the repealed statute at issue here, the proceeds of the regulatory fee could be used only to offset the costs of regulation. Plaintiffs do not dispute this.

The third and final inquiry is whether there is a direct relationship between the fee charged and the service received by those who pay the fee or between the fee charged and the burden produced by the fee payer. "Where such a relationship exists, then the charge may be deemed a regulatory fee even though the charge is not individualized according to the benefit accruing to each fee payer or the burden produced by the fee payer." *Id.* (Citations omitted.) Again, revenues from the regulatory fee in this case could be used only for the regulation of carriers; the Plaintiff class contains the vast majority—95 percent—of the carriers. Moreover, the fee was designed to rise (up to a statutory ceiling of $48) or fall, depending upon the actual costs of regulation. Former RCW 81.80.320.

 We hold the repealed statute imposed a regulatory fee, not a flat tax. It remains to be determined whether the regulatory fee was unfairly apportioned and therefore violated the Commerce Clause, as the trial court held. We wish to address the trial court's rulings in context, however, and to do so, detour for a brief overview of the apportionment issue before turning to our analysis of the regulatory fee.

The United States Supreme Court has required that any state tax on interstate commerce must be (1) applied to an activity with a substantial nexus to the taxing state; (2) fairly apportioned; (3) nondiscriminatory against interstate

commerce; and (4) fairly related to the services provided by the state, in order to pass constitutional muster. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977).

If the regulatory fee were a tax, as Plaintiffs argue, then the question in this case would be whether the tax was properly apportioned within the meaning of the second prong of the *Complete Auto* test, "the central purpose [of which] is to ensure that each State taxes only its fair share of an interstate transaction." *Goldberg v. Sweet*, 488 U.S. 252, 260-61, 109 S. Ct. 582, 102 L. Ed. 2d 607 (1989). The threat of malapportionment is assessed by asking whether the tax is "internally consistent" and, if so, whether it is "externally consistent" as well. The trial court in this case did not reach the question of external consistency, which looks to the economic justification for the State's claim upon the value taxed.

> Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax.

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995).

Although it found the regulatory fee was not discriminatory (under the third prong of the *Complete Auto* test), the trial court found it failed the internal consistency test, was therefore unfairly apportioned, and as such, violated the Commerce Clause. The trial court acknowledged that problems of highway safety requiring a safety program in

Washington are problems common to all states, which could duplicate a regulatory fee on interstate carriers because the safety issues within their boundaries are similarly implicated. This "potential for multiple burdens" on interstate commerce rendered the regulatory fee unfairly apportioned. Clerk's Papers at 1507.

Plaintiffs ask this court to accept the trial court's analysis, which holds that a finding of internal inconsistency alone, in the absence of discrimination in fact, invalidates a tax under the Commerce Clause. Plaintiffs are correct in pointing out courts, on internal consistency grounds, have overturned flat *taxes* imposed on interstate motor carriers without requiring proof of quantifiable discrimination. *See, e.g., American Trucking Ass'ns v. State*, 205 Wis. 2d 494, 556 N.W.2d 761 (Wis. Ct. App.), *review denied*, 207 Wis. 2d 285, 560 N.W.2d 274 (1996); *American Trucking Ass'ns v. Secretary of Admin.*, 415 Mass. 337, 613 N.E.2d 95 (1993).

The State, on the other hand, does not argue the regulatory fee was properly apportioned. Instead, it argues, and we agree, that the regulatory fee was not a tax subject to the apportionment requirement. Specifically, the State maintains a *nondiscriminatory* "fee" (as opposed to a tax) need not be apportioned. The cases cited by Plaintiffs for the proposition that a nondiscriminatory assessment may nevertheless be overturned on internal consistency grounds dealt overwhelmingly with taxes, not regulatory fees.

Courts have rejected claims that regulatory fees must be apportioned. *See, e.g., V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415 (10th Cir. 1997); *Interstate Towing Ass'n v. City of Cincinnati*, 6 F.3d 1154 (6th Cir. 1993). Moreover, there are policy reasons that apportionment rationale should not be extended to nondiscriminatory regulatory fees. As the State points out, if regulatory fees must be apportioned, then other state or local regulatory fees designed to offset the legitimate costs of regulation would be jeopardized. For instance, various state agencies' licensing or filing fees intended to recoup even a portion of administrative costs could be at risk. *See also* Walter

Hellerstein, *Is "Internal Consistency" Foolish?: Reflections on an Emerging Commerce Clause Restraint on State Taxation*, 87 MICH. L. REV. 138 (1988). Professor Hellerstein identified "professional and similar licensing fees that are imposed by every state" as possible victims of strict application of internal consistency to nondiscriminatory regulatory fees:

> Many of these fees are flat and unapportioned, and, for that reason, could be challenged under the "internal consistency" rationale . . . . One feature of these licensing fees, however, arguably insulates them from challenge under the "internal consistency" doctrine. In contrast to . . . exactions . . . presumed to be imposed for general revenue purposes pursuant to the state's taxing power, the levies considered here are presumed to be imposed for regulatory purposes pursuant to the state's police power. However thin that distinction may be in some cases, it is a distinction the law recognizes, and the question for present purposes is whether it is a distinction that makes a constitutional difference insofar as commerce clause (and "internal consistency") analysis is concerned.

Hellerstein, 87 MICH. L. REV. at 156 (footnotes omitted).

Turning now to the promised analysis of the regulatory fee under the Commerce Clause, we note that the stringent standard for appraising tax measures does not apply where the statute at issue qualifies as a regulatory measure:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities . . . .

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970) (citation omitted); *see also Department of Banking & Fin. v. Credicorp, Inc.*, 684 So. 2d 746,

752-53 (Fla. 1996) (inquiring "(1) whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.") (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S. Ct. 1727, 60 L. Ed. 2d 250 (1979)).

The regulatory fee in this case was undeniably evenhanded. It was applied to class and nonclass carriers alike. The trial court found the regulatory fee was not discriminatory, and Plaintiffs do not contest this finding. The State argues the regulatory fee did not discriminate against interstate commerce, and, in any event, Plaintiffs were unable to provide evidence that it did. The State is correct. The regulatory fee was imposed on in-state and out-of-state carriers alike. Moreover, the Plaintiffs were unable to prove the regulatory fee forced them to bear a higher cost per mile than intrastate carriers, and the trial court stated Plaintiffs had not proven discrimination in fact.

What Plaintiffs appear to be claiming on appeal is that a failure of internal consistency is tantamount to discrimination, and that the trial court was "simply wrong" in not recognizing this. Br. of Appellants at 25. The problem with Plaintiffs' argument is that, even if the *Complete Auto* test applied in this case, unfair apportionment (and therefore internal consistency) is different from discrimination in fact. The apportionment issue which internal consistency is designed to address looks to the *potential* for multiple burdens on interstate commerce; internal consistency "asks nothing about the degree of economic reality reflected by the tax[.]" *Oklahoma Tax Comm'n*, 514 U.S. at 185. Discrimination in fact, however, must be proven beyond a reasonable doubt. *High Tide Seafoods v. State*, 106 Wn.2d 695, 698, 725 P.2d 411 (1986). The Plaintiffs are essentially bootstrapping, asking this court to find a failure of internal consistency *is* discrimination in fact. We decline to do so,

especially in the context of regulatory fees, which are not required to be fairly apportioned.

Our second inquiry is whether the repealed statute served a legitimate local purpose. Plaintiffs do not dispute that the State of Washington has a legitimate interest in the regulation, inspection, and safety of trucks using state highways and roads. Indeed, the United States Supreme Court has "recognized the peculiarly local nature" of regulating interstate carriers for safety purposes. *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523, 79 S. Ct. 962, 3 L. Ed. 2d 1003 (1959); *see also Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443, 98 S. Ct. 787, 54 L. Ed. 2d 664 (1978) (stating, "In no field has . . . deference to state regulation been greater than that of highway safety regulation.").

We are convinced the regulatory fee served the legitimate local purpose of funding safety programs and inspections related to trucks on Washington's roads. It is worth noting that Plaintiff carriers pose significant safety concerns not posed by carriers which operate solely in state. For example, Plaintiff carriers are typically away from their bases for two to three weeks at a time, precluding service and maintenance from being performed on their vehicles. Intrastate carriers, on the other hand, are generally back at their bases each night, and as a result are closer to and more likely to avail themselves of maintenance facilities. Another significant safety consideration is the fact that class carriers are paid on a mileage basis, which provides a powerful economic incentive to drive longer hours at a higher speed. Intrastate carriers, on the other hand, are not paid on a mileage basis. We also note Franks & Son, Inc. and Coast Express, Inc., the class representatives in this case, have each been cited for numerous violations of state safety rules. Franks & Son, Inc. was cited several times for, among other things, hours-of-service violations. Coast Express, Inc. was cited 11 times during the period from January 1, 1987, to May 25, 1990, for safety violations, including hours of service, defective equipment, and

driver disqualification. Clearly, regulation of these and other carriers was a proper exercise of the State's police power. During the time the regulatory fee was in place, the State of Washington had one of the better safety records in the nation, due, in part, to an exemplary inspection program by the UTC. The motor carrier safety program proved effective in reducing truck accidents as well as keeping illegal carriers from driving. The regulatory fee funded those efforts.

Finally, we ask whether alternative means could have promoted the State's legitimate interest in a regulatory safety program. Put another way, did the repealed statute place an undue burden on interstate commerce? Plaintiffs bear the burden of showing any incidental burden on interstate commerce was excessive compared to the local interest. Again, Plaintiffs have failed to provide evidence of anything more than an incidental burden on interstate commerce, and have not shown a "clearly excessive" burden. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). In fact, we are hard pressed to say that interstate commerce was even incidentally burdened. "Incidental burdens" on interstate commerce are the burdens on interstate commerce that exceed the burdens on intrastate commerce. *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1425 (10th Cir. 1997). There has been no proof that the Plaintiff class of carriers, or interstate commerce, paid more for the regulatory program than did intrastate carriers.

Moreover, we note the UTC itself provided carriers with alternatives to the regulatory fee. These included floater cards, single trip regulatory fee cards, single trip permits, and lump sum regulatory fees. These options were beneficial to those interstate carriers whose vehicles were not present in Washington for significant periods of time.

The single trip permit and single trip regulatory fee card allowed carriers to forgo paying the annual regulatory fee and instead purchase such a permit or fee card at the border. Floater cards were useful for carriers operating on

fixed routes, for example, from Los Angeles to Seattle. The carrier may have numerous vehicles in its fleet but not know which would be making the trip. A carrier could purchase several of the floater cards and keep them in Los Angeles to be given to a driver whose truck was dispatched to Seattle. These options, which were not available to intrastate carriers, but only to interstate carriers, could result in monetary savings to those who exercised them. That Plaintiffs chose not to use these alternatives is not evidence of a burden on interstate commerce.

■ Accordingly, we hold the repealed statute was a regulatory measure which did not violate the Commerce Clause. We reverse the holding of the trial court with respect to Plaintiffs' dormant Commerce Clause—or "*Scheiner*"—claim.

■ ■ Neither do we find the regulatory fee was unconstitutional as a result of preemption by federal law. Plaintiffs claim the regulatory fee was preempted under 49 U.S.C. § 11506 (1978), in which Congress exercised its authority under the Commerce Clause and directed the ICC to adopt standards under which the states might require motor carriers to prove the lawfulness of their interstate operations. The State persuasively argues otherwise.

Courts have traditionally employed a presumption against federal preemption of state law. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992). Federal law is not preemptive of state law unless Congress has unmistakably so ordained. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963). Regulations purporting to preempt state authority therefore must clearly and unambiguously so intend:

> [B]ecause agencies normally address problems in a detailed manner and can speak through a variety of means . . ., we can expect that they will make their intentions clear if they intend for their regulations to be exclusive.

*Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 718, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985).

There is, moreover, an additional and related judicial " 'assumption that the historic police powers of the States [are] not to be superseded by . . . Federal [law] unless that was the clear and manifest purpose of Congress.' " *Interstate Towing Ass'n v. City of Cincinnati*, 6 F.3d 1154, 1161 (6th Cir. 1993) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947)).

Accordingly, where, as here, the subject matter of the state statute is one within the state's traditional powers, the party arguing federal preemption must show that preemption was the "clear and manifest purpose of Congress.' " *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 206, 103 S. Ct. 1713, 1723, 75 L. Ed. 2d 752 (1983) (quoting *Rice*, 331 U.S. at 230).

The language Plaintiffs allege was preemptory is now repealed, but provided:

> The requirement of a State that a motor carrier, providing transportation . . . register the certificate or permit issued to the carrier . . . is not an unreasonable burden on transportation referred to in [49 U.S.C. § 10521(a)(1), (2)] when the registration is completed under standards of the Commission under subsection (c) of this section. When a State registration requirement imposes obligations in excess of the standards, the part in excess is an unreasonable burden.

Act of October 17, 1978, Pub. L. No. 95-473, 92 Stat. 1448, § 11506(b), *formerly codified at* 49 U.S.C. § 11506(b).

As the State points out, on its face, this language preempted only state registration requirements regarding proof of lawfulness of interstate operations outside the ICC "standards." The statute defines standards to "mean the specification of forms and procedures required by regulations of the [ICC] to prove the lawfulness of transportation . . . ." 49 U.S.C. § 11506(a) (1978). There is nothing in the statute which purports to preempt state regulatory author-

ity or its corresponding power to set regulatory fees. Congress merely authorized the ICC to set uniform *registration* requirements and to confine states to registering interstate carriers in keeping with those requirements. The charges at issue in the repealed state statute were regulatory fees, not fees for the registration of ICC permits.

Plaintiffs also claim collection of the regulatory fee and the federal identification fee at the same time resulted in an unlawful registration requirement exceeding ICC standards. This argument is not compelling. We believe a more realistic rationale for concurrent collection of the two fees was administrative convenience and efficiency.

 Finally, we note that elsewhere in the Interstate Commerce Act Congress expressly preempted state taxes with the type of unambiguous language required. 49 U.S.C. § 14502 (limiting certain taxes on motor carriers). When Congress in one part of a statute preempts state law, the implication is that other matters are not preempted. *See Cipollone*, 505 U.S. at 517. We affirm the holding of the trial court with respect to Plaintiffs' preemption claim.

DURHAM, C.J., and SMITH, GUY, JOHNSON, MADSEN, and TALMADGE, JJ., concur.

SANDERS, J. (dissenting) — The majority opinion rests on the fulcrum that a "regulatory fee" cannot violate the Commerce Clause absent further proof that it discriminatorily burdens interstate commerce in practical effect. I disagree. This fee discriminatorily burdens interstate commerce on its face.

*Fee For Privilege To Use Roads Violates Commerce Clause*

Fine, lawyer-like distinctions between taxes, flat taxes, user fees, and regulatory fees find no place in the text of the Commerce Clause which simply provides, "[C]ongress shall have power . . . To regulate commerce . . . among the several States . . . ." U.S. CONST. art. 1, § 8. The Supreme Court has summarized the purpose of the Com-

merce Clause to create " 'an area of trade free from interference by the States.' " *American Trucking Assocs. v. Scheiner*, 483 U.S. 266, 280, 107 S. Ct. 2829, 2838, 97 L. Ed. 2d 226 (1987) (citing *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 328, 97 S. Ct. 599, 606, 50 L. Ed. 2d 514 (1977)). Thus, even where Congress has declined to legislate, the Supreme Court has construed the language of the Commerce Clause to prohibit the erection of state barriers to interstate commerce by negative inference, known as the *dormant* Commerce Clause. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995).

Whether we characterize this charge as a "tax" or a "regulatory fee" doesn't matter in and of itself—only whether its measure places a heavier burden on interstate than intrastate activities, *Scheiner*, 483 U.S. at 281-82, thus granting a competitive advantage to local truckers at the expense of their interstate competitors. Therefore, the focus of inquiry must be whether the challenged imposition puts interstate commerce to a competitive disadvantage against local commerce.

It may be true this so-called regulatory fee is in a sense compensatory to the State for resources consumed by all fee payers; however, this particular fee is at most compensatory only in a global sense for the total cost of those programs funded by the fee, without distinction between the two subclasses of fee payers: local and interstate truckers. But it is upon that distinction which the Commerce Clause turns. Whether the characterization as a regulatory fee is meaningful for the purposes of determining if a local jurisdiction is levying a tax absent that statutory authority required by our State Constitution is, however, a different question than that posed by the Commerce Clause. Compare *Covell v. City of Seattle*, 127 Wn.2d 874, 905 P.2d 324 (1995), which held that a municipal fee for street improvements is a tax.

Under the Commerce Clause we must hypothesize the imposition of this fee to every state, to test it in one. This

we call the "internal consistency" test. We need not consider the actual "adverse economic impact in dollars and cents upon a participant in interstate commerce for crossing a state boundary" to know such discrimination against interstate commerce exists. *Scheiner,* 483 U.S. at 283-84 n.15. *See also* Majority at 752 (" 'This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue . . . .' ") (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 185, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995)).

Here, for example, we consider a $10.00 charge levied upon any truck for the privilege to operate within this State (RCW 81.80.300) plus a gross tonnage fee of up to $48.00 (RCW 81.80.320). The charge is fixed and flat regardless how many miles are driven, how many safety inspections are conducted, and, most importantly, regardless whether the truck is engaged in wholly intrastate or interstate commerce.[1] But the latter distinction must be made for reasons stated by Justice Frankfurter, whose dissenting language in *Capitol Greyhound Lines v. Brice,* 339 U.S. 542, 557, 70 S. Ct. 806, 94 L. Ed. 1053, 17 A.L.R.2D 407 (1950) (Frankfurter, J., dissenting) was relied upon by the majority in *Scheiner:*

> So long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate carriers pay according to the facilities in fact provided by the State. But a tax levied for the privilege of using roads, and not their actual use, may, in the normal course of operations and not as a fanciful hypothesis, involve an undue burden on interstate carriers. While the privilege extended by a State is unlimited in form, and thus theoretically the same for all vehicles, whether interstate or intrastate, the intrastate vehicle can and will exercise the privilege whenever it is in operation, while the interstate vehicle must necessarily forego the privilege some of the time simply because of its interstate character, *i.e.,*

---

[1]The negative effect of the fee may be mitigated, but not eliminated, by single trip passes. The vice survives in principle as the charge is still for the privilege of using the roads, not the consumption of state resources in any quantitative sense.

because it operates in other States as well. In the general average of instances, the privilege is not as valuable to the interstate as to the intrastate carrier.

*Capitol Greyhound Lines*, 339 U.S. at 557 (Frankfurter, J., dissenting) (*as quoted in Scheiner*, 483 U.S. at 291). In *Scheiner* the Supreme Court struck down Pennsylvania's flat-axle tax levied on each truck for the annual privilege of using Pennsylvania's roads. Here we have a flat $10.00 fee plus a flat tonnage fee for the annual privilege to use Washington's roads. In relevant principle they are indistinguishable, notwithstanding Pennsylvania called it a tax whereas our majority calls it a fee.

Applying this principle to our facts, the subject fee is not apportioned between "the several states" so as to insure that the interstate trucks will not pay more than the truck which is operated wholly within the boundaries of Washington if the scheme were generalized to other states. That is the constitutional problem. I disagree with the majority that a regulatory fee on the privilege to use the roads of a state need not be apportioned to survive constitutional scrutiny, at least when that fee is not based on the consumption of state resources by the actual payer of the fee.[2]

Consider, for example, the interstate trucker on a Boston to Seattle run. The total distance is 2,508 miles requiring travel through at least 11 different states. If each state charged a flat $10.00 fee for an annual road permit, plus a gross tonnage charge, the interstate trucker would pay

---

[2]The majority cites *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415 (10th Cir. 1997) and *Interstate Towing Ass'n v. City of Cincinnati*, 6 F.3d 1154 (6th Cir. 1993) for the proposition that a regulatory fee need not be apportioned; however, each distinguishes *Scheiner* as a case which concerns the privilege of making commercial entrances into a state. In *V-1 Oil* the court observed, "The fees involved here are not assessed 'for the privilege of making commercial entrances into' the State." *V-1 Oil Co.*, 131 F.3d at 1426 (citing *Scheiner*, 483 U.S. at 284); whereas *Interstate Towing* similarly distinguished its facts from *Scheiner* as the fee at issue in *Interstate Towing* was "not charged for the privilege of using the City's streets . . . ." *Interstate Towing Ass'n*, 6 F.3d at 1163. But the statute at issue here does exactly what *V-1 Oil* and *Interstate Towing* claim as the basis to distinguish *Scheiner* as this fee was assessed as a condition precedent to commercial entrances into Washington.

$110.00 per year plus eleven times his applicable gross tonnage charge to ply his trade; whereas the truck which ran an equivalent gross number of miles wholly intrastate between Seattle and Spokane would pay but $10.00 total, plus but one gross tonnage charge. Necessarily the intrastate trucker would be at a competitive advantage to his interstate counterpart because his "regulatory fee" would be less than a tenth of that required of his competitor, although the interstate trucker's use of Washington roads is considerably less. Such result discriminatorily burdens interstate commerce whether we call it a regulatory fee, a tax, or some other name.

That it also violates the Commerce Clause is not fairly debatable as "[i]f each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred." *Scheiner*, 483 U.S. at 284. This conclusion necessarily holds true no matter how each of the states spends the resulting revenue. Whether the money is placed in a trust fund for highway purposes or is spent on public education, the bottom line is interstate commerce is put to a competitive disadvantage. That is precisely what the Commerce Clause was enacted to prevent.

Although the aforementioned really disposes of the majority's argument, we might go further to distinguish how a regulatory or user fee (or tax, for that matter) might pass Commerce Clause muster. *Scheiner* calls this "The User-Fee Defense" and discusses it in some detail. *See Scheiner*, 483 U.S. at 289-92. A "user fee" is the purest form of regulatory fee in that it is a fee levied to compensate the government for resources expended on a particular user's behalf. A toll bridge fee might be an example, as would an airport service fee for the passenger's use of airport facilities. *See Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 92 S. Ct. 1349, 31 L. Ed. 2d 620 (1972). Although these fees "burden" interstate commerce, they do not violate the Commerce Clause

because, as Franks and Son, Inc., put it, "if every state assessed a transaction-based $1.00 'user fee' for each passenger boarding a commercial aircraft operating from an airport within the state, no single boarding would be subject to more than one state's fee." Appellants' Reply Br. at 15.

In the case at bar, however, the fee is for the privilege of using the roads, not the degree of actual use to which they are put. The fee is not based upon the consumption of State resources by the interstate trucker. If permitted, this fee can be multiplied as the truck crosses each state boundary without regard to the actual use of the road system "or with some other proxy for value obtained from the State." *Scheiner*, 483 U.S. at 291. The conclusion must therefore necessarily follow that

> when the measure of a tax bears no relationship to the taxpayers' presence or activities in a State, a court may properly conclude under the fourth prong of the *Complete Auto Transit* [*Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977)] test that the State is imposing an undue burden on interstate commerce.

*Scheiner*, 483 U.S. at 291 (quoting *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 629, 101 S. Ct. 2946, 69 L. Ed. 2d 884 (1981)).

In the same sense that a broken clock is right twice a day, the flat $10.00 fee, plus the gross tonnage charge, may be compensatory to the State in a given case, or in the aggregate of all such fees paid by all truckers, intrastate and interstate; however, compensatory in that sense or not, it still discriminates against interstate commerce because the interstate trucker, by definition, pays the same amount for the privilege to use the state's roads only part of the time, which the intrastate trucker pays to use the roads all of the time. This fee cannot be distinguished from the one held unconstitutional in *Scheiner*.

### Refund Is the Proper Remedy
Although the majority found it unnecessary to reach the

question of remedy, because it found no constitutional violation, I conclude once the violation is established a full refund is appropriate.

Were we to call the remedy for this current application of an established principle to new facts "retroactive," then so be it as the United States Supreme Court has upheld such retroactive effect as the general rule, unless each of the following conditions to justify an exception is satisfied:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Chevron Oil Co. v. Huson*, 404 U.S. 97, 106-07, 92 S. Ct. 349, 30 L. Ed. 2d 296 (1971) (quoting *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965) and *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S. Ct. 1897, 23 L. Ed. 2d 647 (1969)) (citations omitted).

Clearly the ruling, as I would posit it, finds its specific source by, at least, 1987 in the *Scheiner* case, and a refund of every payment subsequent to that date is appropriate without necessity of further discussion.

ALEXANDER, J., concurs with SANDERS, J.